■ SEYMOUR GILLMAN, Respondent, v CHASE MANHATTAN BANK, N. A., Appellant.—In an action, *inter alia,* to recover moneys segregated from the checking account of Jamaica Tobacco & Sales Corp., the defendant Chase Manhattan Bank appeals from a judgment of the Supreme Court, Queens County (Hyman, J., on decision; Lonschein, J., on judgment), dated January 9, 1987, which, after a nonjury trial, is in favor of the plaintiff and against it in the sum of $1,218,476.37.

Ordered that the judgment is reversed, on the law and the facts, with costs, and the complaint is dismissed.

Jamaica Tobacco & Sales Corp. (hereinafter Jamaica Tobacco), located in Queens, New York, was a business engaged

in the wholesale trade of tobacco and related items. As such, it was required to purchase cigarette tax stamps from the City and State of New York and to attach them to each package sold. Jamaica Tobacco generally purchased these stamps on a credit basis, collateralized by a surety bond from Aetna Casualty and Surety Company (hereinafter Aetna). Aetna required security for its bond in the form of a bank letter of credit.

On July 28, 1981, Stephen Frohlich, the president of Jamaica Tobacco applied to the defendant Chase Manhattan Bank, N. A. (hereinafter Chase) for a $400,000 letter of credit. Immediately above the signature line, the application form provided in bold print and capital letters that "The Security Agreement on the reverse hereof is hereby accepted and made applicable to this Application and the Credit". On the reverse thereof, and in pertinent part, the form contained provisions which essentially gave Chase the right to set off any of its obligations under the letter of credit against any account balance maintained by Jamaica Tobacco, and to apply the proceeds or balance to any potential obligation in the event that it felt insecure. Frohlich testified that he never read this security agreement and that no one at Chase had brought it to his attention. On August 10, 1981, Chase issued the irrevocable letter of credit for the benefit of Aetna. In conjunction therewith, Chase required Frohlich to sign a subordination agreement, a negative pledge agreement and personal guarantees. Jamaica Tobacco also opened and maintained a checking account with Chase.

In October 1982 Frohlich met with the officers of the bank and his accountant. At the outset of the meeting, Chase assured him that the letter of credit had been reissued in August 1982. However, upon reviewing Jamaica Tobacco's financial statement of October 1982 covering the year 1981, Chase's officers became concerned with the financial state of the corporation and they asked Frohlich for collateral. Frohlich refused to provide collateral because he claimed that he did not have any further assets. He explained that the corporation had experienced difficulty when he had left control thereof with his son-in-law and his son-in-law's brother; he had fired them and retaken control. In addition, Chase's officers accused him of violating the subordination agreement because the financial statement showed that debts to the officers had decreased. Frohlich denied that Jamaica Tobacco had paid off any of its debts to its officers.

A few days later, Chase deemed itself insecure and segregated $372,921 from Jamaica Tobacco's checking account into

a separate account. Chase had discovered that, shortly after their officers' meeting with him, Frohlich had allowed his parents to file UCC perfecting statements against the corporation to secure their loans upon its accounts receivables and inventory.

Aetna did not made a demand under the letter of credit until June 2, 1983. Chase paid out under its obligation on June 22, 1983. However, by this time, Jamaica Tobacco had been put out of business and one month after the segregation, Jamaica Tobacco executed an assignment for the benefit of its creditors. The instant action brought by the assignee of Jamaica Tobacco ensued.

The plaintiff alleged that the transfer by Chase had constituted a preference which had enabled it to obtain a greater percentage of its debt than the other creditors of the same class under Debtor and Creditor Law § 15 (6-a). In addition, the plaintiff sought the return of the moneys under a theory of conversion. Finally, the plaintiff sought consequential damages in the amount of $1,500,000 for Jamaica Tobacco's obligations to its creditors as a result of the wrongful dishonor of their checks by Chase.

Chase essentially denied the allegations of the complaint, and asserted that it had lawfully segregated the funds from Jamaica Tobacco's checking account under its rights pursuant to the security agreement on the reverse of the application for the letter of credit. In addition, Chase asserted that it had acted in good faith in so doing, and that, since it had paid out the funds to Aetna pursuant to its demand on June 22, 1983, it had no funds owing to Jamaica Tobacco and in fact it had a deficiency with Jamaica Tobacco in the amount of $27,079. Finally, it claimed that the plaintiff had waived any claim he had and that he was estopped from maintaining the action.

After a trial of the action in which, by motion to conform the pleadings to the proof, Jamaica Tobacco asserted an additional claim premised upon the allegedly unconscionable terms of the security agreement, the trial court determined that the terms of the security agreement were unconscionable. The court determined that, since the application for the letter of credit was labeled as such, it was reasonable for Frohlich to have considered it in its limited function and to have assumed that any conditions upon the granting of credit would have been imposed at the time the letter of credit was actually approved, and not in the application. The court also found that the clauses granting the right to segregate funds from

the account were unreasonably favorable to Chase because they provided it with the opportunity to seize and deplete Jamaica Tobacco's account and to completely destroy its credit and its business without giving it the opportunity to alleviate any insecurity. The court further found that the terms of this security agreement were so unfair and manifesting of a lack of good faith and common business decency that those terms shocked the conscience and good judgment of the court. It was noted that the terms were in fine print and were inconspicuous to the point of being unreadable and that there was never any proof offered to show that such an agreement was being commonly used in the industry. Moreover, the trial court determined that the act of Chase in segregating the funds constituted not only a conversion but also an avoidable preference, and that Chase had wrongfully dishonored the checks issued upon the account at a time when there were more than sufficient funds to cover those checks. Therefore, the court found that Chase was liable for consequential damages under UCC 4-402 to the extent of the $372,921 segregated by Chase and including the loss of rebates testified to by Frohlich, plus interest. Finally, the court found that the actions of Chase were so immoral and egregious that it awarded the plaintiff punitive damages in the amount of $500,000.

The general rule is that if the signer of an agreement could have read it in its entirety, to not have read it was gross negligence. If he could not read it, then he should procure someone to read it for him and to fail to do so is equally negligent. In either case, the agreement is binding upon him *(see, Wallach Agency v Bank of N. Y.,* 75 AD2d 878). Therefore, it is incumbent upon the signer of a contract to read it and his claim that he failed to do so will not generally serve to invalidate the contract *(see also, Leasing Serv. Corp. v Simpkins Metal Bldgs.,* 638 F Supp 896).

Moreover, the doctrine of unconscionability has little applicability in the commercial setting because it is presumed that businessmen deal at arm's length with relative equality of bargaining power *(see, Equitable Lbr. Corp. v IPA Land Dev. Corp.,* 38 NY2d 516, 523; *see, Lister Elec. v Incorporated Vil. of Cedarhurst,* 108 AD2d 731, 734; *see, Cayuga Harvester v Allis-Chalmers Corp.,* 95 AD2d 5, 20). Apparently, the doctrine is primarily a means with which to protect the "commercially illiterate consumer beguiled into a grossly unfair bargain by a deceptive vendor or finance company" *(Equitable Lbr. Corp. v IPA Land Dev. Corp., supra,* at 523).

There is no possible explanation for Frohlich's failure to

have read the security agreement on the reverse of the application or to have procured counsel to read it for him. According to the testimony of Frohlich himself, he had received the completed but unsigned application from Chase in his office. At that time, and before signing it, he could have read it at his leisure. Furthermore, although the print is fine and the lines are close together, the actual language is entirely readable. Moreover, there is a "conspicuous" legend (see, Uniform Commercial Code § 1-201 [10]) immediately above the signature line which is in capital letters and bold print and which clearly directed his attention to the security agreement on the reverse side. Furthermore, it is noted that this letter of credit was not the first one that Frohlich had applied for or had received. He had been in the business of selling tobacco products for 15 years, and he was well aware that Chase was assuming a great risk by giving such credit. Moreover, there is nothing inherently wrong with the attempt by Chase to decrease its exposure under the letter of credit by giving it some means to secure payment from Jamaica Tobacco inasmuch as the letter of credit was irrevocable and had established an obligation that was independent from the ability of Jamaica Tobacco to reimburse.

In addition, other factors militate against a finding of unconscionability. Firstly, there is no evidence that it was necessary for Frohlich to have dealt with Chase in seeking the letter of credit such that he would have had no meaningful choice in accepting the terms of the security agreement. He could have gone to any other bank to apply for a letter of credit. Moreover, the size of the transaction alone should have alerted Frohlich to the necessity of reading all of the papers provided by Chase and it was unreasonable for him not to have considered that Chase would be seeking additional security for its substantial risk.

The trial court's other findings were also erroneous. As there is no ground to uphold the determination that the provisions of the security agreement were unconscionable or that Chase had acted in bad faith, there is no support for the finding that it had converted funds or wrongfully dishonored Jamaica Tobacco's checks.

Finally, the claim that the segregation of funds constituted a preferential transfer under Debtor and Creditor Law § 15 (6-a) must also fail. Once we assume that the security agreement was valid and binding, its effect was to create a perfected security interest in the account balance in Chase's favor because the bank's possession of that collateral served to

perfect the interest *(see,* Uniform Commercial Code § 9-305). Since Chase was a secured creditor which is entitled to reimbursement from the estate of the debtor for the entire value of its obligation, the segregation of the account balance to the extent of $372,921 did not "enable [it] to obtain a greater percentage of [its] debt than some other creditor of the same class" *(see,* Debtor and Creditor Law § 15 [6-a]). Mangano, J. P., Thompson, Lawrence and Eiber, JJ., concur.