OPINION OF THE COURT
Hancock, Jr., J.
This appeal presents questions concerning actions taken by Chase Manhattan Bank, N. A. (Chase) with respect to the commercial bank account of a customer, Jamaica Tobacco and Sales Corp. (Jamaica Tobacco) which Chase contends were authorized by the terms of a security agreement executed by the customer in applying for a letter of credit. Chase issued a $400,000 irrevocable letter of credit to Jamaica Tobacco as account party for the benefit of Aetna Casualty and Surety Company (Aetna). Aetna required the letter of credit for its issuance of a surety bond to enable Jamaica Tobacco to purchase cigarette stamps on credit from State and local governmental agencies. The security agreement, Chase contends, gave it a security interest in all bank deposits maintained in Chase by Jamaica Tobacco.
*7 This lawsuit brought by the assignee for the benefit of creditors of Jamaica Tobacco stems from actions taken by Chase without notice to Jamaica Tobacco in segregating a $372,920.57 bank deposit by transferring it from a checking account to an account over which Jamaica Tobacco had no control and on which it could not draw. These actions were authorized under the agreement, Chase contends, because of Jamaica Tobacco’s precarious financial condition. Chase claims further that they were commercially reasonable steps necessary to secure it from potential loss because of the absolute obligation it had assumed under the letter of credit.
After a nonjury trial, Supreme Court concluded that the security agreement was unconscionable and, therefore, unenforceable. Accordingly, it held that Chase acted illegally in transferring the funds from the checking account to the other account and thereby putting the funds beyond the reach of Jamaica Tobacco. The court awarded compensatory, consequential and punitive damages to the assignee, finding that Chase had acted in bad faith and that it had caused or contributed to Jamaica Tobacco’s subsequent business collapse by failing to notify it of the transfer of the account, dishonoring checks payable to the company’s creditors, and preventing Jamaica Tobacco from using the funds in its business.
The Appellate Division reversed on the law and the facts and dismissed the complaint, holding that the security agreement was neither substantively nor procedurally unconscionable. It reversed Supreme Court’s finding that Chase had acted in bad faith and held that "there is no support for the finding that it had converted funds or wrongfully dishonored Jamaica Tobacco’s checks” (135 AD2d 488, 492). Finally, the Appellate Division rejected the assignee’s arguments that segregation of the account constituted a preferential transfer in violation of Debtor and Creditor Law § 15 (6-a) (id., at 492-493).
In his appeal by leave of this court, the assignee contends that the Appellate Division erred in rejecting his arguments concerning the unconscionability of the security agreement and Chase’s alleged bad faith in segregating the account without notice and dishonoring the checks. He also argues that, even assuming the validity of the security agreement and insufficient proof of bad faith, the segregation of the deposit should, nonetheless, be set aside as a preferential transfer in violation of the Debtor and Creditor Law. For reasons which follow, we reject these arguments and conclude that there should be an affirmance.
*8 I
Jamaica Tobacco, for many years prior to this proceeding, was engaged in the wholesale distribution of tobacco products in the New York City metropolitan area. It was a closely held, family run business. From 1964 on, the company had been managed primarily by Steven Frohlich, its president and majority stockholder.
As part of its regular business of distributing tobacco products, Jamaica Tobacco purchased tax stamps from the city and State. Before they would issue tax stamps on credit, the taxing authorities insisted on a security bond of a surety company. The surety company (here, Aetna) required, as a condition for its assumption of liability under the bond, that Jamaica Tobacco provide it with a bank letter of credit to secure Jamaica Tobacco’s promise to reimburse it for any payments that it might be required to make under the bond.
Prior to August of 1981, Jamaica Tobacco had obtained a $300,000 letter of credit from Marine Midland. When it requested an increase to $400,000, Marine Midland declined and Jamaica Tobacco applied to Chase. In late July 1981, Chase sent an application for a letter of credit to Stephen Frohlich who signed it on behalf of Jamaica Tobacco. Directly above Frohlich’s signature on the application was a printed legend in bold-faced type stating: "The Security Agreement on the reverse hereof is hereby accepted and made applicable to this Application and the Credit.”
The security agreement, in paragraph 7, provided, in part, that "[a]s security for the payment or performance of any and all * * * obligations and/or liabilities” of Jamaica Tobacco under the letter of credit, whether "absolute or contingent, due or to become due”, Jamaica Tobacco "pledges to the Bank and/or gives the Bank a general lien upon and/or right of set-off against, all right, title and interest of the Applicant in and to the balance of every deposit account, now or at any time hereafter existing, of the Applicant with the Bank, and any other claims of the Applicant against the Bank, and in and to all property, claims and demands and rights and interests therein of the Applicant * * * which * * * shall * * * come into the Bank’s possession, custody or control * * * for any purpose, whether or not for the express purpose of being used by the Bank as collateral security or for * * * any other or different purpose”.
Paragraph 8 of the security agreement stated, in part, that *9 if Chase "shall in good faith deem itself insecure at any time * * * any and all obligations and liabilities of the Applicant to the Bank * * * shall become and be due and payable forthwith without notice or demand; and the Applicant * * * expressly authorizes the Bank * * * to apply * * * any balance of deposits and any sums credited by or due from the Bank to the Applicant in general account or otherwise, to the payment of any and all of such obligations and/or liabilities” (emphasis added).
On August 10, 1981, Chase issued an irrevocable letter of credit in favor of Aetna for Jamaica Tobacco as account party. Its one-year term was renewable automatically unless Chase elected not to renew and gave Aetna the required notice prior to the renewal date. Under the letter of credit, Chase assumed a binding obligation to pay up to $400,000 to Aetna upon presentation by Aetna of proper documentation. As the account party, Jamaica Tobacco undertook to reimburse Chase for any payments made on its behalf to Aetna.
As security for the letter of credit — in addition to the pledge of and general lien upon its bank accounts — Jamaica Tobacco provided Chase with the following: a "Negative Pledge” agreement confirming that it would not allow anyone else to file against the company under the Uniform Commercial Code while Jamaica Tobacco was indebted to Chase, a "Loan Restriction” agreement confirming that Jamaica Tobacco would not incur any loan debts while indebted to Chase, personal guarantees of amounts then or thereafter owed from Jamaica Tobacco to Chase signed by the principal officers of Jamaica Tobacco and their wives, and a "Subordination Agreement” stating that Jamaica Tobacco was indebted to Frohlich in the amount of $450,000 and that that debt was subordinated to Jamaica Tobacco’s obligations to Chase.
After the letter of credit had been renewed in August 1982 for an additional year, Chase learned that Jamaica Tobacco was experiencing serious financial and managerial difficulties. In October 1982, Chase received information indicating that Jamaica Tobacco had repaid part of its debt to Frohlich in violation of the "Subordination Agreement”, had borrowed $110,000 from Frohlich’s parents in violation of the "Loan Restriction”, and had permitted a UCC filing in favor of Frohlich’s parents in contravention of the "Negative Pledge” agreement.
On the basis of such information, Chase deemed itself to be *10 insecure with respect to Jamaica Tobacco’s financial condition and its ability to meet its commitments under the letter of credit. Acting under the security agreement, Chase, on October 25, 1982, transferred the funds on deposit in Jamaica Tobacco’s checking account to an account entitled "Other Demand Deposits”. Jamaica Tobacco had no access to the transferred funds. Because no funds remained in the checking account, checks drawn on it were subsequently dishonored. Some months later, in June 1983, Aetna presented its sight draft and was paid by Chase in accordance with the letter of credit. After these transactions, Jamaica Tobacco remained in debt to Chase in the approximate sum of $27,000.
Jamaica Tobacco executed a deed of assignment for the benefit of creditors on November 5, 1982 and the assignee commenced this action in May of 1984 to nullify the segregation of the bank account as a "preferential transfer” and for damages and other relief.
II
We address first the basic determination of the trial court on which its grant of relief is premised: that the security agreement was unconscionable when entered into and, therefore, unenforceable (see, UCC 2-302). An unconscionable contract has been defined as one which "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible according to its literal terms. (See 1 Corbin on Contracts, § 128, p. 400.)” (Mandel v Liebman, 303 NY 88, 94.) The doctrine, which is rooted in equitable principles, is a flexible one and the concept of unconscionability is "intended to be sensitive to the realities and nuances of the bargaining process” (Matter of State of New York v Avco Fin. Serv., 50 NY2d 383, 389-390). A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made — i.e., "some showing of an 'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party’ (Williams v Walker-Thomas Furniture Co., 350 F2d 445, 449).” (Matter of State of New York v Avco Fin. Serv., supra, at 389; see also, Jones v Star Credit Corp., 59 Misc 2d 189,192.)
The procedural element of unconscionability requires an examination of the contract formation process and the alleged *11 lack of meaningful choice. The focus is on such matters as the size and commercial setting of the transaction (see, UCC 2-302 [2]), whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power (see, Matter of State of New York v Avco Fin. Serv., supra, at 390; State of New York v Wolowitz, 96 AD2d 47, 67; White and Summers, Uniform Commercial Code § 4-3, at 150 [2d ed]).
Here, the claim of procedural unconscionability is based solely on Frohlich’s testimony that he was unaware of the terms in the security agreement, that the security agreement was never called to his attention, that he never read it, that no one read it to him, and that, indeed, he did not know of its existence. There is no allegation of deception or that Frohlich lacked experience or expertise. Nor is there any suggestion that the application was signed as a result of high-pressured tactics. On the contrary, Frohlich signed the instrument in his own office where he had time to study it and, if necessary, to discuss it with a lawyer. The contract concerned a type of commercial transaction routinely entered into in the course of Jamaica Tobacco’s business and one with which Frohlich was necessarily familiar from his several years of running the business.
Frohlich signed the application form immediately below the bold-face legend stating: "The Security Agreement on the reverse hereof is hereby accepted and made applicable to this Application and the Credit.” He states that he did not read the front of the form or the legend but gives no explanation for his failure to do so. Under the general rule, Jamaica Tobacco would be conclusively bound by the security agreement irrespective of Frohlich’s testimony that he did not read it and was unaware of its terms (see, Metzger v Aetna Ins. Co., 227 NY 411, 416; 9 Wigmore, Evidence § 2415 [Chadbourn rev 1981]). Indeed, it has been held that the failure of a signer to read an instrument in circumstances analogous to those here amounts to gross negligence (see, Pimpinello v Swift & Co., 253 NY 159, 162-163; Wallach Agency v Bank of N. Y., 75 AD2d 878, 879). Given the commercial setting of this transaction, Frohlich’s claim that he was unaware of the security agreement provisions — even if the claim were to be fully credited — does not support a determination of procedural unconscionability (see, Equitable Lbr. Corp. v IPA Land Dev. Corp., 38 NY2d 516, 518, n 2, 523; Cayuga Harvester v Allis- *12 Chalmers Corp., 95 AD2d 5, 21; Leasing Serv. Corp. v Simpkins Metal Bldgs., 638 F Supp 896, 899 [SD NY 1986]). Neither does the argument that the terms of the security agreement were inconspicuous because typed in fine print on the reverse side of the application, nor the contention that Frohlich was not alerted to its existence. While the location and the size of print may, in a proper case, be factors bearing on procedural unconscionability, they have no bearing where, as here, the existence of the security agreement was clearly noted in boldface print directly above the signature line (see, Equitable Lbr. Corp. v IPA Land Dev. Corp., 38 NY2d 516, 518, n 2, supra)
Nor are we persuaded by the assignee’s argument that the security agreement was substantively unconscionable. This question entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged (see, Matter of State of New York v Avco Fin. Serv., supra, at 389). While determinations of unconscionability are ordinarily based on the court’s conclusion that both the procedural and substantive components are present (see, Matter of State of New York v Avco Fin. Serv., supra, at 389), there have been exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone (see, State of New York v Wolowitz, 96 AD2d 47, 68, supra; White and Summers, Uniform Commercial Code § 4-7, at 164, 165 [2d ed]). The contract terms in question here would clearly not fall within this exceptional category. Moreover, considering their commercial context, their purpose, and their effect, we conclude, that by any reasonable standard, those terms were not so overbalanced in favor of Chase as to be found substantively unconscionable.
A determination of the commercial reasonableness of the terms in the security agreement authorizing Chase to segregate the checking account without notice requires an examination of Chase’s obligations under the letter of credit. Under a letter of credit, the issuer must honor a draft or demand for payment from the beneficiary so long as the documents presented conform to the terms of the letter of credit. The issuer’s obligation to honor a properly presented draft is independent of any underlying contractual arrangement between the account party (i.e., its customer) and the beneficiary. Thus, the issuer must honor the draft irrespective of whether the underlying contract has been properly performed *13 (see, Matter of Supreme Mdse. Co. v Chemical Bank, 70 NY2d 344, 350-352; First Commercial Bank v Gotham Originals, 64 NY2d 287, 294, 295; UCC 5-114; Harfield, Practice Commentary, McKinney’s Cons Laws of NY, Book 62½, UCC 5-114, at 686; Official Comment, McKinney’s Cons Laws of NY, Book 62½, UCC 5-114, at 688). Upon issuing the $400,000 letter of credit on behalf of Jamaica Tobacco, Chase became unconditionally obligated to honor a draft upon presentation of conforming documentation, including a showing that the draft was necessary to cover Aetna’s liability under its surety bond with Jamaica Tobacco.
Banks, when issuing letters of credit like the one granted to Jamaica Tobacco here, typically require terms that create security interests in bank deposits of the account party (see, e.g., the clause, identical to para 7 of the security agreement here, used in Dolan, Letters of Credit, at A-82 — A-83; see also, Practising Law Institute, Letters of Credit and Bankers’ Acceptances, at 103-112 [1986]). The purpose of such a security agreement is, of course, to provide the issuing bank with the means of protecting itself from potential loss due to the financial inability of the account party to make the promised reimbursement for any payment the issuing bank is required to make to the beneficiary. Paragraphs 7 and 8 of the security agreement here provided this protection by giving Chase, the issuing bank, a security interest in the deposits of Jamaica Tobacco, the account party, under which Chase had a right, if, in good faith, it deemed itself to be insecure, to segregate Jamaica Tobacco’s bank deposits without notice.
It is this contractual right of the issuing bank to take action with respect to the bank deposits without first notifying Jamaica Tobacco which the assignee attacks as unreasonably advantageous to the issuing bank. But it is precisely this aspect of the arrangement — i.e., that the issuing bank was authorized to take such action without notice to the account party — which gave paragraphs 7 and 8 their effectiveness as a protective measure; for if advance notice had been required, the account party could have defeated the purpose of the security interest by the simple expedient of withdrawing its funds.
The aim of the Uniform Commercial Code unconscionability provision (UCC 2-302), it has been said, is to prevent oppression and unfair surprise, not to readjust the agreed allocation of the risks in the light of some perceived imbalance in the *14 parties’ bargaining power (see, Matter of State of New York v Avco Fin. Serv., supra, at 389; Official Comment, McKinney’s Cons Laws of NY, Book 62½, UCC 2-302, at 193, 194). Here, when the two commercial parties to the contract entered into the arrangement, they were aware that Jamaica Tobacco would customarily be carrying a debt for credit purchases of tax stamps at a level close to the limit in the letter of credit. To be able to make such credit purchases to the limit of $400,000, Jamaica Tobacco required the backing of Chase’s credit and it asked Chase to assume the obligations and attendant risks in issuing a letter of credit. In return, Jamaica Tobacco gave Chase a security interest in its checking account. In doing so, it necessarily assumed the risk that the bank might find it necessary to take action without prior notice with respect to that account. In contending that we should hold this arrangement to be unconscionable as being unreasonably favorable to the bank, the assignee necessarily asks us to disturb the allocation of risks to which the parties have agreed. We decline to do so.
Ill
The assignee argues that, even if the security agreement was not unconscionable, Chase’s conduct in segregating Jamaica Tobacco’s checking account and dishonoring checks drawn thereon without first notifying Jamaica Tobacco was impermissible and justified the relief granted by the trial court. It must be noted that on this appeal Jamaica Tobacco does not challenge the conclusion that when Chase acted under paragraphs 7 and 8, it could, in good faith, have deemed itself to be insecure because of the information received concerning Jamaica Tobacco’s financial condition and the indicated violations by Jamaica Tobacco of the "Negative Pledge”, "Loan Restriction”, and "Subordination Agreement”. Instead, the assignee advances two other arguments: (1) that paragraphs 7 and 8 of the security agreement did not give Chase a security interest in Jamaica Tobacco’s checking account and (2) that even if Chase had such a security interest, it acted with commercial bad faith in its conduct with respect to the Jamaica Tobacco bank account so as to warrant the imposition of compensatory, consequential and punitive damages.
The argument that Chase did not acquire a security interest in the checking account requires little discussion, *15 because by the express terms of paragraph 7 such an interest was unmistakably granted. The operative provisions in paragraph 7 plainly stated that Jamaica Tobacco, as security for its obligations, absolute or contingent, due or to become due, "pledgefd] to the Bank and/or g[ave] to the Bank a general lien upon” (emphasis added) all of its intérests in the balances of every account then or at any time thereafter existing with the bank. It is true, as the assignee points out, that the question whether paragraph 7 created a security interest is governed by the common law and not by the provisions of article 9 of the Uniform Commercial Code.[1] But, under the common law, there is nothing to prevent the parties from creating a security interest in bank deposits by appropriate terms in an agreement making specific reference thereto (see, e.g., Updike v Manufacturers Trust Co., 243 App Div 15, 19; Haight v Brown, 159 Misc 652, 655; 9 NY Jur 2d, Banks and Financial Institutions, § 303, at 541 [1980]; cf., People’s Natl. Bank v Hewitt, 226 App Div 412, 415). The language in paragraph 7 is sufficiently specific to create a security interest in Jamaica Tobacco’s checking account.
The assignee contends, nevertheless, that even if Chase had a valid security interest, the standards of commercial reasonableness required that it notify Jamaica Tobacco before segregating the checking account. In particular, he argues that Chase violated the implied standard of good faith inherent in every contract (see, UCC 1-203; see also, UCC 1-201 [19]) both by failing to warn of the impending segregation and by showing continued confidence in Jamaica Tobacco when it renewed the letter of credit shortly before segregating the checking account. The assignee asserts, in effect, that, assuming Chase held a valid security interest in the account, it nevertheless had an implied good-faith duty to do the very thing — i.e., give advance notice of its intention of segregating the account — which could well have resulted in the depletion of the account and the destruction of its security interest. We know of no authority supporting such a proposition. The assignee’s reliance on K.M.C. Co. v Irving Trust Co. (757 F2d 752 [6th Cir 1985]) is misplaced. That case did not involve the bank’s actions with respect to a security interest specifically granted in a bank deposit. The question in K.M.C. was *16 whether a bank acted in good faith in refusing to continue to advance funds within the maximum limits of an agreed line of credit.
Moreover, we agree with the Appellate Division that there was no basis for Supreme Court’s finding of bad faith in the bank’s subsequent dishonor of Jamaica Tobacco’s checks. If, as we hold, there was no commercial bad faith in Chase’s actions in segregating the account without notice — and putting it beyond the reach of Jamaica Tobacco — there could be no basis for a finding of bad faith when checks drawn on the segregated account were subsequently returned unpaid.[2]
Nor, contrary to the assignee’s arguments, does it matter that, at the time of the segregation of the account, Aetna had not yet presented a draft to Chase for payment and that, therefore, nothing was then due from Jamaica Tobacco to Chase under paragraph 1 of the security agreement. Paragraph 7, when the security agreement was executed, contemporaneously vested Chase with a security interest in Jamaica Tobacco’s checking account. The express purpose of granting the security interest was to secure Chase for the promised performance of the future as well as present obligations being assumed by Jamaica Tobacco. There is no question that when it acted to effectuate its security interest by segregating the account, Chase had good reason to believe that Jamaica Tobacco was insolvent. It knew that Jamaica Tobacco’s indebtedness for tax stamps purchased on credit was running close to the limit of $400,000. Chase could well have assumed that Aetna would almost certainly be called upon to pay this sum under its bond and that it, in turn, as issuer of the letter of credit, would eventually be required to reimburse Aetna. Under these circumstances, Chase cannot be held to have acted in bad faith when it took steps to safeguard the fund in which it had an existing security interest and which would, in all likelihood, constitute the only available asset for its reimbursement.
IV
Finally, the assignee argues that the bank’s action in *17 segregating the checking account constituted a preferential transfer in contravention of Debtor and Creditor Law § 15 (6-a).[3] Thus, he says, he is entitled to recover the sum of $372,920.57, the amount of the transferred account, with interest from October 25, 1982. The assignee maintains, in effect, that even if the security agreement was effective to create a security interest in Jamaica Tobacco’s checking account, as we hold it was, the security agreement should not result in putting the bank in a priority position with respect to the other creditors because the bank elected not to take actual control of the account until October 25, 1982, the date of the segregation. Because the assignment for the benefit of creditors took place on November 5, 1982 — within four months of the October 25, 1982 segregation — and because both Jamaica Tobacco and the bank were aware of Jamaica Tobacco’s insolvency, the assignee contends that the transfer should be set aside. The assignee’s argument must fail because subdivision (6-a) applies only to transfers which are voluntary.
By express terms of the statute, a preferential transfer must be "a voluntary transfer from the assignor [the insolvent debtor] of money or property for or on account of an antecedent debt” (Debtor and Creditor Law § 15 [6-a] [emphasis added]). Subdivision (6-a) was added (L 1950, ch 758, § 5) as one of the recommendations made by the New York State Law Revision Commission intended to bring the New York statute pertaining to assignments for the benefit of creditors (Debtor and Creditor Law art 2) into general conformity with the Bankruptcy Act (see, 1950 Report of NY Law Rev Commn, 1950 NY Legis Doc No. 65 [L], at 15-25). The purpose of the *18 amendment was to enact the equitable rule recognized in other States that a transfer may be set aside as a constructive fraud on creditors if it is made or permitted to be made by the debtor when the creditor receiving the transfer has reasonable cause to believe that the debtor is insolvent (id., at 15-16, 50-52, 69-70).
As with the section permitting the assignee to set aside a transfer made by the debtor in fraud of his creditors (Debtor and Creditor Law § 15 [6]; see also, Real Property Law § 268; EDPL 13-3.6), the assignee’s right to set aside a transfer under subdivision 6-a presupposes some action undertaken by the debtor which unfairly disadvantages one or more of his creditors (see, e.g., Reynolds v Ellis, 103 NY 116; Truesdell v Bourke, 29 App Div 95, affd 161 NY 634; 23 Carmody-Wait 2d, NY Prac § 142:46; 30 NY Jur 2d, Creditors’ Rights and Remedies, § 474). The equitable theory underlying the assignee’s right to set aside such a transfer would, therefore, be incompatible with any transfer which is not the result of some voluntary act by the debtor. Indeed, the Law Revision Commission stated specifically, in its report, that its recommendations did "not extend to involuntary transfers suffered by the debtor” (id., at 15). Thus, it has been held that the lien of a properly obtained judgment — even if the judgment creditor was aware of the debtor’s insolvency — does not constitute a "voluntary transfer” within the meaning of Debtor and Creditor Law § 15 (6-a) (see, Matter of Resnicks, Binghamton, Inc., 69 Misc 2d 454, 456; see also, Truesdell v Bourke, 29 App Div 95, 97, affd 161 NY 634, supra).
Here, if the transfer sought to be set aside as preferential is Chase’s action on October 25, 1982 in segregating Jamaica Tobacco’s checking account, the requirement of subdivision (6-a) cannot be met. That transfer could not have been one voluntarily made by Jamaica Tobacco. On the contrary, Jamaica Tobacco strenuously urges that the October 25, 1982 segregation was made by Chase without its knowledge and against its will. Nor can the assignee obviate the "voluntary transfer” requirement in subdivision (6-a) by looking to the August 1981 security agreement for the purpose of adopting its voluntary aspect. Obviously, the security agreement cannot serve the purpose since it does not comply with the statute’s four-month time limitation.
*19 Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander and Titone concur; Judge Bellacosa taking no part.
Order affirmed, with costs.

. Contrary to the Appellate Division decision (135 AD2d 488, 492-493), article 9 of the UCC is inapplicable to the transfer of an interest in a bank deposit (UCC 9-104 [l]).

. The assignee made no claim of "commercial bad faith” in his complaint or amended complaint; to the extent that the assignee conformed the pleadings to the proof adduced at trial, he alleged bad faith only with respect to Chase’s "failing to provide notice or demand prior to the [segregation]” of the $372,920.57 on October 25, 1982 (trial court opn, record, at 19).

. Debtor and Creditor Law § 15 (6-a) states, in pertinent part: “The court shall have power * * * To authorize an assignee to bring an action, which he is hereby empowered to maintain, against any person, who with reasonable cause to believe the assignor was insolvent as defined in section thirteen of this act, has within four months of the assignment received a voluntary transfer from the assignor of money or property for or on account of an antecedent debt, the eifect of which transfer is to enable the creditor to obtain a greater percentage of his debt than some other creditor of the same class, and the assignee may recover the property so transferred or its value. For the purpose of this section a transfer shall be deemed to have been made when it is so far perfected that no creditor having a judgment on a simple contract without special priority (whether or not such a creditor exists) could have obtained an interest superior to that of the transferee therein. A transfer not so perfected prior to the assignment shall be deemed to have been made immediately before the assignment.”