OPINION OF THE COURT
Carolyn E. Demarest, J.
Plaintiff Direct Capital Corporation moves, pursuant to CPLR 3212, for summary judgment against defendants New ABI Inc., doing business as ABI Inc., and Angela Lu, also known as Angela Huang (collectively defendants), for breach of a finance lease contract for photo printer equipment and default under a related personal guaranty; pursuant to CPLR 3211, for dismissal of defendants’ affirmative defenses; and for an order prohibiting the removal, transfer, concealment, disposition, sale, pledging, and/or assignment of the leased equipment and directing the sheriff in the appropriate county to seize the equipment.
Facts and Procedural History
Plaintiff commenced the instant action to recover the balance allegedly due under an equipment finance lease and personal guaranty executed by Angela Lu covering photo printer equipment supplied by third-party defendant Mullersohn Foto Labor Technik, G.M.B.H., a German manufacturer of photo printers and related equipment for use in photo duplicating.
In March or April 2005, an entity known as World Images Digital (WID), purportedly acting as a representative of Mullersohn, solicited ABI for the sale of a photo printer and related equipment for use in ABI’s retail photo print shop. ABI and WID subsequently entered into a contract for the sale of the photo equipment as reflected in a letter dated April 11, 2005. In that letter, which preceded any relationship with plaintiff, Jens Jensen, president of WID states:
“3) I confirm that you can return the scanners if you are not satisfied with the results produced. I confirm that we will either refund any payment made for scanners or replace them with scanners that you like, as you wish. You have unrestricted right of return on the scanners for 60 days after installation is finished.
“4) You can rest assured that your warranty will be *1153 honored under all circumstances. Müllersohn has been in the business since 1936, we have been in business since 1994 and we currently have a very big success with the Müllersohn printers and minilabs.”
The letter further indicated that ABI was preapproved for financing with monthly payments of $1,845.10 for 60 months, and that upon receipt of ABI’s down payment, delivery was guaranteed. An 11-page “Order Confirmation/Bill of Sale,” for signature by defendants, appears to have been enclosed with this letter. The order confirmation recites the specifications of the merchandise to be purchased for a “Total Package price” of $118,965 less a trade-in credit of $10,000. Page three of this document states: “We . . . World Images Digital, Inc. . . . hereby confirm to have sold to . . . New A.B.I, Inc. . . . the following equipment [description omitted].” This document further provides:
“Payment: The above-mentioned equipment is to be financed via leasing . . .
“Buy out after lease $1.00 (one dollar).
“We will set up automatic bank transfer for the monthly payments.”
It further provides:
“Payment of the price; Security interest.
“The above mentioned equipment is to be financed (leased) or paid cash. If paid cash the purchase price is payable upon delivery on cashiers check or certified funds. If any instalment [szc] is not paid when due, World Images Digital Inc. can declare the entire purchase price to be immediately due and payable. The buyer will pay interest at 19% per annum on any part of the purchase price that is not paid when due.
“World Images Digital Inc. reserves a security interest in the equipment until the purchase price is paid in full. The buyer authorizes World Images Digital Inc. to sign the buyer name to and to file a financing statement describing the equipment in order to perfect the security interest. World Images Digital Inc. may reposes [szc] the equipment and foreclose it’s [sic] security interest upon the buyer’s failure to pay the purchase price, or any part thereof, when due. The complete equipment as listed above will be the property of World Images Digital Inc. till paid in *1154 full, please sign here.”
Despite the reference to financing via lease, to the unsophisticated, it would appear from the language of the order confirmation that an exclusively bilateral contract between WID and ABI was contemplated, particularly in light of WID’s retention of the right “to reposses[s] the equipment and foreclose it’s [sic] security interest” upon buyer’s default (see “Arbitration-litigation”). On May 17, 2005, ABI paid WID a $25,000 down payment.
Subsequently, a “CONTRACT” dated August 9, 2005, on the letterhead of “MüllerSOHN” was presented to the president of ABI (addressed as 28 Minute Photo), Benson Huang. This document, which is signed on behalf of WID and Mullersohn, indicates that WID was unable to perform under its contract with Mr. Huang and Mullersohn was taking over performance, in return for which Mr. Huang would pay to Mullersohn the agreed purchase price pursuant to the contract with WID “before delivery by bank transfer or Letter of Credit.” Thereafter, by letter dated August 18, 2005, addressed to Angela Lu at ABI, plaintiff provided the lease documents upon which this action is brought.
On August 20, 2005, defendants executed the written commercial equipment lease agreement and guaranty whereby plaintiff agreed to lease the equipment to ABI. By letter dated August 19, 2005 to defendant Angela Lu, Direct Capital explained that the proposed agreement was “a business financing agreement” and described the credit evaluation process and personal exposure of the business owner. No mention is made therein of a waiver of warranty. Pursuant to the terms of the lease, ABI selected the equipment listed on exhibit A from Mullersohn, which was acquired by plaintiff and then leased to ABI. The balance on the lease, after payment of an “Advance Rental [Payment]” of $1,999.30 plus a “Documentation Fee” of $1,300, was payable in 60 consecutive monthly installments (the initial term), in the amount of $1,844.80, exclusive of taxes thereon. Although the equipment was not delivered until September 26, the lease agreement executed August 20 includes an acknowledgment that the equipment had been delivered and installed and was “in good condition, working order” to the satisfaction of lessee. In slightly bolded, minuscule type, paragraph 2 of the lease, contained within the numerous boilerplate provisions beginning on page 2, entitled “Disclaimer of Warranties and Claims; Limitation of Remedies,” provides, in pertinent part:
*1155 “There are no warranties by or on behalf of Lessor. Lessee acknowledges and agrees as follows: a) Lessor makes no warranties, either express or implied, against interference or infringement with respect to the Equipment or as to the condition of the Equipment, its merchantability, its fitness or suitability for any particular purpose, its design, its capacity, its quality, or with respect to any characteristics of the Equipment; b) [Lessee has inspected Equipment and is satisfied with condition]; c) Lessee leases the Equipment ‘as is’ and with all faults; ... e) If the Equipment is not properly installed, does not operate as represented or warranted by the supplier or manufacturer, or is unsatisfactory for any reason, regardless of cause or consequence, Lessee’s only remedy, if any, shall be against the supplier or manufacturer of the Equipment and not against Lessor; f) Provided Lessee is not in default under this Lease, Lessor assigns to Lessee any warranties made by the supplier or manufacturer of the Equipment;[1] g) Lessee shall have no remedy for consequential or incidental damages against Lessor; and h) No defect, damage, or unfitness of the Equipment for any purpose shall relieve Lessee of the obligation to pay rent or relieve Lessee of any other obligation under this lease. The Lessor and Lessee have specifically negotiated and agreed to the foregoing paragraph.”
On the face of the lease, immediately above the signatures of the parties, enclosed within a box and bolded in all capital letters larger than the typeface used throughout the balance of the lease, appears the caveat: “THIS IS A NONCANCELABLE/ IRREVOCABLE LEASE, THIS LEASE CANNOT BE CAN-CELLED OR TERMINATED.” In much smaller, nonbolded type, under “ACCEPTANCE OF DELIVERY” and included within a six-sentence paragraph, the lease states: “You understand and agree that we have purchased the equipment from supplier(s) and you may contact the supplier(s) for your warranty rights, if any, which we transfer to you for the term of the lease.” This paragraph does not expressly caution the lessee that it will have no recourse against lessor for defects in the *1156 equipment but does contain lessee’s acknowledgment that the equipment has already “been furnished” and that installation has been satisfactorily completed.
On or about September 26, 2005, the equipment was delivered to ABI and ABI tendered to plaintiff the first monthly rental payment due under the lease.[2] Almost immediately following delivery of the equipment, defendants began experiencing problems and contacted WID and Mullersohn which sent a servicer to make repairs. When the problems continued, and after several days in which the equipment was inoperative, not satisfied with the services supplied by Mullersohn or WID, defendants twice contacted plaintiff in October and November alleging fraud in the transaction and stating that they were unable to pay under the lease because of the defects in the equipment and the resultant loss of business. ABI defaulted under the lease by failing to make the monthly payment that was due on November 1, 2005, and by failing to make any further payments. Plaintiff demanded payment from defendants but no payment has been made. Defendant ABI has never attempted to reject the equipment and retains possession to this day.
Plaintiff commenced the instant action on or about February 21, 2006, seeking to recover damages for breach of the equipment lease. The complaint also seeks an order prohibiting the transfer, disposition or assignment of the equipment, and directing seizure of the equipment by the sheriff in the appropriate county. Defendants interposed an answer and third-party complaint against Mullersohn and Sterling raising as an affirmative defense that “by virtue of Mullersohn’s default under its contract with ABI [plaintiff] is barred from recovery herein.”
Arguments
In support of its motion for summary judgment, plaintiff annexes the affidavit of Mr. Shaun Buswell, litigation manager and employee of plaintiff, who argues that, as a result of ABI’s default under the lease, and upon plaintiff’s election under paragraphs 15 and 24, all of the obligations of ABI due and to become due under the lease, became immediately due and pay *1157 able. Paragraph 15 of the lease, entitled “Loss and Damage,” obligates the lessee to bear the risk of loss and damage to the equipment and, in the event of a complete loss, to pay the lessor, among other charges, the stipulated lease value, namely, all amounts due to the lessor under the lease, including the accelerated balance of the total amounts due for the remaining term of the lease. Paragraph 24 of the lease, entitled “Default and Remedies,” provides, in substance, that if the lessee fails to make payments when due, the lessor can elect to sue for and recover from the lessee any and all amounts due under the lease, including the “Stipulated Lease Value” as defined by the lease, enter lessee’s premises without notice and recover or “render unusable” the equipment, and sell or re-lease the equipment without notice to lessee. This paragraph authorizes plaintiff to both recover the full value of the lease and repossess the equipment.
Mr. Buswell also asserts, and the lease provides, that pursuant to paragraphs 15, 17 and 24, ABI is required to reimburse plaintiff for all taxes paid, payable or required to be collected by plaintiff by reason of ABI’s use and/or rental of the equipment valued at $8,262.78; that paragraphs 15 and 24 of the lease entitle plaintiff to recover all costs and expenses incurred in collecting amounts due and owing under the lease, including attorney’s fees; and that paragraph 22 entitles plaintiff to recover interest on all delinquent amounts due under the lease calculated at 15% per annum from the date of default. The present discounted value of the delinquent balance on the lease as of November 1, 2005 is $98,660.03. The fair market value of the equipment is $50,000. (The $70,000 set forth in the complaint was an error.)
In addition, Mr. Buswell asserts that by virtue of the personal guaranty executed by Angela Lu on August 20, 2005, Ms. Lu is unconditionally indebted to plaintiff for the present-valued discounted balance of payments due under the lease.
Finally, Mr. Buswell notes that, pursuant to paragraph 24 of the lease, in the event of ABI’s default, plaintiff is entitled to repossess the equipment. Given that the equipment can be easily moved, secreted, or sold, and ABI’s history of default and refusal to return the equipment despite a demand to do so, Mr. Buswell argues that plaintiff is entitled to an order prohibiting the removal of the equipment and directing its seizure.
Counsel for plaintiff reiterates that pursuant to paragraph 2 of the lease, plaintiff made no representations or warranties to *1158 ABI regarding the equipment, nor does it have any obligation to service the equipment. Counsel cites paragraph 2 (h) of the lease, which states that “[n]o defect, damage or unfitness of the Equipment for any purpose shall relieve Lessee of the obligation to pay rent or relieve Lessee of any other obligation under this Lease,” as well as paragraph 15 of the lease, which provides that “no . . . damage ... of the Equipment shall relieve Lessee of the obligation to pay rent or to comply with any other obligation under this Lease.”
Counsel asserts that the waiver of warranty provision is in full compliance with UCC 2-316 (2), which requires that the waiver be conspicuous within the meaning of UCC 1-201 (10), and argues that pursuant to UCC 2-A-214, an equipment lessor is entitled to waive any and all warranties in writing and that the language “as is,” as set forth in the lease, is sufficient to modify and exclude warranties. Thus, plaintiff contends that any alleged damage or imperfections in the equipment do not relieve defendants of their obligations to plaintiff under the lease or guaranty.
With respect to plaintiffs entitlement to repossess the equipment, counsel adds that it has purchased a bond in an amount twice the fair market value of the equipment. As to counsel fees, counsel states that, to date, plaintiff will have incurred fees in excess of $1,600.
In opposition, Benson Huang, president of ABI and husband of Angela Lu, submits a sworn affidavit in which he states that Mullersohn was joined as a third-party defendant because it sold the equipment to ABI and guaranteed its performance and fitness for ABI’s use. He asserts that while Mullersohn remained liable on this guarantee, there was “some question” concerning the party with whom ABI contracted. Specifically, Mr. Huang states that ABI first dealt with WID, whose “position” was taken over by Mullersohn in August 2005, and that Mullersohn’s position was taken over almost immediately thereafter by plaintiff. He also avers that ABI was not represented by counsel during contract review and negotiations and that ABI entered into the financing agreement as “an accommodation” to Mullersohn.
Mr. Huang claims that almost immediately after delivery, the equipment repeatedly malfunctioned. He argues that plaintiffs motion should be denied until it is determined whether Mullersohn complied with its express obligations under its guarantee, and whether plaintiff, as Mullersohn’s assignee, is liable for *1159 Mullersohn’s breach of contract. Mr. Huang claims that if the motion is not denied, ABI’s “reward for complying with Mullersohn’s request to first substitute itself for [WID] and then to be substituted for by [plaintiff] will be substantial loss — to the point where it may not be able to remain in business.” As to plaintiffs demand that ABI turn over the equipment, Mr. Huang claims that the equipment must be retained as evidence in defendants’ defense and as security against any judgment entered against Mullersohn.
In another sworn affidavit, Ms. Lu avers that when the lease was presented to her for signature, she was told that it was “for financing purposes only” and that it would not affect “the stance of the transaction which had been entered into between ABI and Mullersohn as supplemented by agreement with [WID].” She also states that ABI was not represented by counsel during “these discussions and [that] the agreements were prepared by Mullersohn, [WID] and/or Direct”; that during negotiations, she was not told that there was a waiver of warranty included in the agreement, which may have prevented defendants from entering into the lease; and that she was advised that “the agreements” were “merely formal changes required to obtain the necessary financing for the purchase, similar in scope to when one purchases a car.”
Counsel for ABI argues that the waiver of warranty provision in the lease is unenforceable and seeks leave to amend ABI’s answer should the court require this defense to be separately pleaded. Counsel further contends that plaintiff acquired its rights through Mullersohn and that plaintiffs rights against ABI are subject to Mullersohn’s performance of the contract, including applicable warranties. Counsel asserts that plaintiffs remedy lies against Mullersohn. Noting that Mullersohn is a German corporation which does not have a registered agent for service of process in New York, counsel states that he is currently arranging for service of process on Mullersohn through a German attorney.
In ABI’s memorandum of law, ABI argues that the waiver of warranty provision does not comply with UCC 2-316 (2) and is therefore ineffective because the disclaimer is not set forth in conspicuous print but rather is buried in a mass of small similar print on the third page of the seven-page lease, and is neither larger nor bolder than the remainder of the print on the page. Counsel contends that assuming the waiver of warranty provision is held to be unenforceable, plaintiffs liability under the *1160 lease is “questionable” inasmuch as there is evidence that the equipment was defective, not fit for the purpose intended, and in violation of the warranty of merchantability implied in all similar contracts. Counsel maintains denying recovery to plaintiff against ABI “is an equitable result for, accepting [plaintiffs] argument will leave ABI effectively without remedy even though entry into the equipment lease was at Mullersohn’s behest and for Mullersohn’s sole benefit.” Counsel for ABI further asserts that seizure of the equipment is not warranted because ABI needs the equipment to prove its case at trial. Counsel also argues that the equipment constitutes ABI’s security should it receive a judgment against Mullersohn, which, as a German corporation, is essentially judgment proof. ABI offers to permit inspection of the equipment by plaintiff and Mullersohn.
In reply, plaintiff reiterates that ABI’s defense that the equipment was defective is insufficient to defeat plaintiffs motion as a matter of law since, based upon the waiver of warranty provision, plaintiff made no representations or warranties to defendants regarding the equipment, and plaintiff has no obligation to service the equipment. Counsel states that defendants were at all times aware that plaintiff is not responsible for the equipment, and it would be inappropriate to deny the motion until it can be determined whether defendants’ own chosen vendor (Mullersohn) has complied with its obligations to defendants, if any. Counsel argues that in a finance lease transaction like the subject lease agreement here, the obligations of the vendor are independent of plaintiff’s claim against the defendants and that the clause above defendants’ signatures in bold, large font upper case letters, “THIS IS A NONCANCELABLE/IRREVOCABLE LEASE, THIS LEASE CANNOT BE CANCELLED OR TERMINATED,” makes ABI’s obligation to make rental payments under the lease absolute and unconditional.
Analysis
“A third-party finance agreement is an agreement whereby a third party agrees to provide the financing between a supplier and a consumer” (Netrix Leasing, LLC v K.S. Telecom, Inc., 2001 WL 228362, *4, 2001 US Dist LEXIS 25402, *12 [SD NY, Mar. 7, 2001]). “In a finance lease, the lessee negotiates directly with the supplier or manufacturer and then arranges for the lessor to buy the goods to lease them to the lessee” (General *1161 Elec. Capital Corp. v National Tractor Trailer School, 175 Misc 2d 20, 27 [1997], citing 2 White and Summers, Uniform Commercial Code § 13-3 [Practitioner’s 4th ed 1995]). “[I]n order for a lease to qualify as a third-party finance agreement, the lessor must not select, manufacture, or supply the goods” (Netrix Leasing, 2001 WL 228362, *4, 2001 US Dist LEXIS 25402, *12, citing UCC 2-A-103 [1] [g]). “The transaction between the lessor and the lessee is therefore first and last a financial transaction” (General Elec. Capital Corp., 175 Misc 2d at 27, citing 2 White and Summers, Uniform Commercial Code § 13-3 [Practitioner’s 4th ed 1995]). Thus, “[i]n such a situation it makes no sense to treat the lessor as a seller with warranty liability to the lessee, nor to free the supplier or manufacturer from the promises that it would have made in an outright sale to the lessee” (id,.). Although statutorily defined as recently as 1995 (UCC 2-A-103 [1] [g], as added by L 1994, ch 114, § 1), it is now well settled that third-party finance agreements are given full force and effect (see General Elec. Capital Corp. v National Tractor Trailer School, 175 Misc 2d 20 [1997]; Preferred Capital v PBK, Inc., 309 AD2d 1168 [2003]; Unistar Leasing, Div. of United Computer Capital Corp. v Betco, Inc., 12 AD3d 1161 [2004]; Unistar Leasing, Div. of United Computer Capital Corp. v Lipkin, 12 AD3d 1166 [2004]; Advanta Leasing Servs. v Laurel Way Spur Petroleum Corp., 11 AD3d 571 [2004]; Canon Fin. Servs. v Medico Stationery Serv., 300 AD2d 66 [2002]; ConTel Credit Corp. v Mr. Jay Appliances & TV, 128 AD2d 668 [1987]; Commercial Credit Corp. v CYC Realty, 102 AD2d 970 [1984]; Leasecomm Corp. v Datalink Resources Corp., 1 Misc 3d 11 [2003]).
In accordance with UCC 2-A-103 (1) (g), defendants selected the subject equipment from Mullersohn, paid Mullersohn a down payment, and entered into the lease with plaintiff to finance the equipment. By submitting the subject lease and proof that defendant defaulted thereon after making only one payment, plaintiff has met its initial burden of establishing its entitlement to judgment as a matter of law. Although defendants’ answer indicates that the equipment was defective, under the terms of the lease, plaintiff made no representations or warranties to defendants regarding the equipment. In this regard, paragraph 2 of the lease provides, in pertinent part, that “[t]here are no warranties by or on behalf of the Lessor”; that “Lessor acknowledges and agrees . . . [that] Lessor makes no warranties, either express or implied . . . with respect to the Equipment or as to the condition of the Equipment, its *1162 merchantability, its fitness or suitability for any particular purpose, its design, its capacity, its quality . . that “Lessee leases the Equipment ‘as is’ and with all faults . . that “if the Equipment ... is unsatisfactory for any reason . . . Lessee’s only remedy, if any, shall be against the supplier or manufacturer of the Equipment and not against the Lessor.” The lease further provides that “[n]o defect, damage, or unfitness of the Equipment for any purpose shall relieve the Lessee of the obligation to pay rent or relieve Lessee of any other obligation under this Lease.” Such provisions are typical of a finance lease designed to comply with UCC 2-A-103 (1) (g). (Canon Fin. Servs., 300 AD2d at 67.) The lease expressly states that “Lessee agrees . . . that it is the intent of both parties to this Lease that the Lease qualify as a statutory finance lease under Article 2A of the [UCC].” Moreover, pursuant to paragraph 3 of the lease, defendants expressly agreed that they selected the equipment and vendor, that plaintiff did not participate in that selection, and. that defendants are requesting plaintiff to acquire the equipment on their behalf by purchasing the equipment from the vendor.
Defendants’ demand that the court deny or hold the motion in abeyance pending a determination as to whether Mullersohn complied with its express obligations to guarantee performance of the equipment is rejected. As the court held in an analogous case, “Whatever the liability of the third-party defendant! ] to [defendants], [it is] not [a] part[y] to the Lease. [Defendants’] liability to [plaintiff] is independent of [its] claims against the supplier and manufacturer, as UCC article 2-A and the Lease terms clearly delineate” (General Elec. Capital Corp., 175 Misc 2d at 30-31; see also ConTel Credit Corp., 128 AD2d at 669). Thus, plaintiff, as lessor, has the right to enforce the lease regardless of defendants’ disputes with the supplier of the equipment (id.). ,
Defendants maintain that the waiver of warranty provision (paragraph 2) is ineffective since it is not sufficiently conspicuous as that term is defined by UCC 2-316 (2) and 1-201 (10). UCC 2-316 (2) provides, in pertinent part, that “to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous.” UCC 1-201 (10) provides, in pertinent part, that
*1163 “[a] term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals ... is conspicuous. Language in the body of a form is ‘conspicuous’ if it is in larger or other contrasting type or color . . . Whether a term or clause is ‘conspicuous’ or not is for decision by the court.”
The critical waiver of warranty provision here, “Disclaimer of Warranties and Claims; Limitation of Remedies,” quoted above, appears on the second page of the equipment lease agreement as paragraph 2. It is essentially buried in the text of a six-page document. The typeface is identical to the surrounding provisions and is almost imperceptibly darker than other text. In examining the appearance of page 2, the court notes that the slightly darker print of paragraph 2 may be perceived to be the result of a defect in the printing rather than an intentional effort to draw the reader’s attention to the provision. It does not appear adjacent to the signature lines and is separated from the critical payment details, the guaranty and the clearly highlighted, boxed and bolded “drop-dead” caveat indicating that the lease is “NONCANCELABLE/IRREVOCABLE” and “CANNOT BE CANCELLED OR TERMINATED” by being placed on a separate page contained within 32 boilerplate paragraphs.
The test to determine whether a clause is “conspicuous” so as to satisfy UCC 2-316 “is whether a reasonable person would notice the disclaimer when its type is juxtaposed against the rest of the agreement.” (Commercial Credit Corp. v CYC Realty, 102 AD2d 970, 972 [3d Dept 1984], citing 1 Anderson, Uniform Commercial Code §§ 1-201:54-1—201:58, at 210-212 [3d ed].) This court finds the disclaimer at issue not to be conspicuous but rather to be deliberately obscured in the single-spaced, fine print, multiple provisions of boilerplate of the agreement so as to conceal its effect rather than drawing the reader’s attention to it. (Compare ConTel Credit Corp. v Mr. Jay Appliances & TV, 128 AD2d 668 [2d Dept 1987] [disclaimers in bold print on face of document directly above signatures were conspicuous]; Sky Acres Aviation Servs. v Styles Aviation, 210 AD2d 393 [2d Dept 1994] [bolded preprinted disclaimer on invoice of sale readily noticeable]; Commercial Credit Corp. v CYC Realty, supra [disclaimer in dark, bold print on front, in only four-paragraph first page of agreement and not on the back with boilerplate, would “call attention to itself’].)
*1164 However, UCC 2-A-212 and 2-A-213 expressly exclude the imputation of implied warranties of merchantability and fitness for a particular purpose to finance leases. Express warranties may be created by representation contained within the lease (see UCC 2-A-210), but UCC 2-A-214 (3) (a) provides:
“[U]nless the circumstances indicate otherwise, all implied warranties are excluded by expressions like ‘as is,’ or ‘with all faults,’ or by other language that in common understanding calls the lessee’s attention to the exclusion of warranties and makes plain that there is no implied warranty, if in writing and conspicuous.”
Though not “conspicuous” within the entire lease, paragraph 2 does contain all the prescribed statutory language. Moreover, paragraph 3 expressly states that the lease is meant to qualify as “a statutory finance lease under Article 2A of the Uniform Commercial Code.”
Article 2-A was added to New York’s UCC, effective June 30, 1995, to cover leases of goods, as distinguished from sales, which are dealt with under article 2. Within article 2-A are provisions specifically dealing with “finance leases” in which the lessor is only supplying the funds to cover the cost of merchandise or equipment that is actually selected and purchased at the lessee’s direction from a third-party vendor. As noted in the Comment to UCC 2-A-101, these “leasing transactions substitute the supplier of the goods for the lessor as the party responsible to the lessee with respect to warranties and the like.” (UCC 2-A-101, Comment, reprinted in McKinney’s Cons Laws of NY, Book 62½, UCC 2-A-101, at 314.) Such was the legislative intent. Further, where the finance lease is not a consumer lease, as is the case here, the so-called “hell or high water” clause pursuant to which the lease becomes irrevocable and noncancelable and requires the lessee to make payments irrespective of any defects in performance, is fully enforceable in New York in the absence of fraud. (See Wells Fargo Bank, N.A. v BrooksAmerica Mtge. Corp., 419 F3d 107, 110 [2d Cir 2005]; UCC 2-A-407.)
While defendants have used the word “fraud” in resisting plaintiff’s claims, there is no evidence thereof. As is evident from the earliest documentation, the intent was to finance defendants’ purchase through a finance lease. Defendants were provided with numerous written documents which they discussed with plaintiff and with the vendor. When the equipment *1165 malfunctioned, they promptly contacted Mullersohn under the warranty provided by that company. Defendants are experienced business people who are charged with knowledge of the substance of the contractual documents they signed. (Gillman v Chase Manhattan Bank, 73 NY2d 1, 11 [1988]; Maines Paper & Food Serv. v Adel, 256 AD2d 760 [3d Dept 1998].) There is no evidence that defendants were unable to understand the terms or were pressured in any way. (See, e.g., Advanta Bus. Servs. Corp. v Colon, 4 Misc 3d 117 [App Term, 2d Dept 2004].) Having accepted and retained the equipment even to this day despite plaintiffs demands for possession, defendants are bound to the terms of the lease.[3] (Canon Fin. Servs. v Medico Stationery Serv., 300 AD2d 66 [2002].)
Plaintiff moves to dismiss defendants’ affirmative defenses pursuant to CPLR 3211, claiming that the only affirmative defense which defendants appear to raise is their uncertainty as to whether they are obligated to make payments to plaintiff or to third-party defendant Sterling. However, the record reveals that defendants entered into the lease and guaranty with plaintiff and, while plaintiff assigned the lease and guaranty to Sterling, Sterling subsequently reassigned the lease and the guaranty back to plaintiff. Since there is no claim by Sterling against defendants, this affirmative defense is dismissed.
Defendants’ other affirmative defense, that plaintiff is barred from recovery because Mullersohn defaulted under its contract with defendants by providing defective equipment, is also dismissed. It has already been established that plaintiff is entitled to recovery despite the fact that the equipment supplied by Mullersohn was defective since plaintiff made no representations or warranties to defendants regarding the equipment and has no obligation to service it. Moreover, to the extent that the affirmative defense may be read to suggest that plaintiff is an agent of Mullersohn, and is therefore liable for providing the defective equipment, such a theory is rejected as there is no evidence of any agency relationship in the record.
Finally, plaintiffs seek an order prohibiting the removal, sale or assignment of the equipment and, pursuant to CPLR 7102, *1166 directing the sheriff to seize the equipment. Plaintiff satisfied its burden of establishing “both a likelihood of success in the action and the absence of a valid defense to its claim.” (Orix Credit Alliance v Grace Indus., 232 AD2d 537, 537 [1996].) In addition, paragraph 24 of the lease entitles plaintiff to repossess the equipment. Plaintiff has thus made a prima facie showing of its entitlement to the provisional remedy of seizure (CPLR 7102 [d]; cf. Merchants Bank of N.Y. v Itzkoff, 1 AD3d 178, 178-179 [2003]) and has posted a bond in an amount twice the fair market value of the equipment as required by CPLR 7102 (e).
Based upon the provisions in the lease, and in the absence of any opposition by defendants with respect to the sums demanded, that branch of plaintiffs motion for summary judgment against defendants for breach of the lease and guaranty is granted. Plaintiff is entitled to be compensated for the present-valued discount balance of payments due under the lease, $98,660.03, plus interest thereon calculated at the rate of 15% per annum from the November 1, 2005 date of defendants’ default, plus taxes in the sum of $8,262.78, plus all costs and expenses incurred in collecting amounts due and owing under the lease, including reasonable attorney’s fees in the amount of $2,100. The motion to dismiss defendants’ affirmative defenses is granted. That branch of the motion prohibiting the removal, transfer, concealment, disposition, sale, pledging and/or assignment of the equipment is granted. That branch of the motion seeking an order directing seizure of the equipment pursuant CPLR 7102 is granted to the extent of directing the sheriff of any county where the equipment is located to seize the equipment, and if the equipment is not delivered to said sheriff, permitting the sheriff to break open, enter, and search for the equipment at 1959 86th Street, Brooklyn, New York, 11214 and/or 1763 77th Street in Brooklyn, New York, 11214.

. Under this provision, the lessee cannot even seek recourse to the manufacturer’s warranties if it has not paid the lessor since the right to such contractual remedies remains with lessor.

. On or about September 27, 2005, plaintiff assigned all of its right, title and interest in and to the equipment, the lease, and all payments due under the lease to third-party defendant Sterling National Bank. As a result of ABI’s default, on or about January 27, 2006, Sterling assigned and transferred all of its right, title and interest in and to the equipment, the lease and payments due thereunder back to plaintiff.

. Carbo Indus. v Becker Chevrolet (112 AD2d 336 [2d Dept 1985]), handed up by defendants at oral argument, is inapposite to the case herein. Carbo preceded enactment of UCC article 2-A and involved manufacturer’s warranties upon a leased automobile. While containing a discussion regarding the need for a conspicuous disclaimer of a dealer’s warranties, the issues at bar had nothing to do with a finance lease.