Carmine Dell Aquila, Plaintiff,

against
Thomas Rubio, administrator of the Estate of Joseph O. Rubio, SMITHTOWN NISSAN, INC., and THOMAS RUBIO, Defendants.


33561-12

WESTERMAN BALL EDERER MILLER & SHARFSTEIN, LLP
Attorneys for Plaintiff
1201 RXR Plaza
Uniondale, New York 11556
STEVEN G. LEGUM, ESQ.
Attorney for Defendants Smithtown Nissan, Inc., and Thomas Rubio, administrator of the Estate of Joseph O. Rubio 
170 Old Country Road
Mineola, New York 11501


Elizabeth H. Emerson, J.

Upon the following efiled documents numbered 235-286 read on this motion to enforce settlement and cross-motion for summary judgment ; Notice of Motion and supporting papers 235-250 ; Notice of Cross Motion and supporting papers 257-260 ; Answering Affidavits and supporting papers251-256; 270-285 ; Replying Affidavits and supporting papers 261-269; 286 ; it is,
ORDERED that the branches of the motion by the plaintiff which are for an order enforcing the settlement agreement between the plaintiff and Joseph Oscar Rubio dated January 29, 2014, and discontinuing all claims and counterclaims between the plaintiff and the defendant Thomas Rubio, administrator of the Estate of Joseph O. Rubio, are granted; and it is further
ORDERED that the motion is otherwise denied; and it is further
ORDERED that the cross motion by the defendants Smithtown Nissan, Inc., and Thomas Rubio, administrator of the Estate of Joseph O. Rubio, for summary judgment dismissing the complaint insofar as it is asserted against them and for an order disqualifying the law firm of Westerman Ball Ederer Miller & Sharfstein, LLP, as attorneys for the plaintiff is denied.
Before his death, Joseph Oscar Rubio ("Oscar") had a 75% ownership interest in the defendant Smithtown Nissan, Inc. ("Smithtown Nissan" or "the dealership"), which sold and serviced new Nissan motor vehicles pursuant to a franchise agreement. Smithtown Nissan had a line of credit with Nissan America Motor Acceptance Corporation ("NMAC") for the financing of its inventory. NMAC advanced funds to Smithtown Nissan, which was required to pay NMAC back after the cars were sold and delivered to customers. On or about July 6, 2012, NMAC inspected Smithtown Nissan's inventory and determined that the dealership owed it approximately $900,000 for cars that had already been sold and delivered. Unable to obtain traditional financing, Oscar approached the plaintiff, with whom he had a long-standing relationship and who was a friend of his son Gary, about an emergency loan in order to avoid the dealership being shut down or having its inventory repossessed by NMAC. The plaintiff agreed to lend Oscar $900,000,[FN1]
 guaranteed by Smithtown Nissan, Gary Rubio, and Andrew Rubio (Oscar's grandson). Oscar's attorney, Martin Margolis, prepared the loan documents after consulting with the plaintiff and the Rubios regarding the contents thereof. The loan was for a term of 30 days at 8% interest per annum. A $20,000 placement fee was due for the plaintiff's services in connection with the funding of the loan 10 days after the loan was made. As collateral for the loan, Oscar agreed to pledge his 75% interest in Smithtown Nissan and $750,000 in an escrow account at People's United Bank. He also agreed that he and his wife would provide the plaintiff with a negative pledge not to place any further encumbrances or liens on their home in St. James, New York, which was already encumbered by two mortgages in the aggregate amount of $650,000. On July 6, 2012, the plaintiff funded the loan, and NMAC was paid. Also on July 6, 2012, the promissory note and some of the other loan documents were executed. The pledge of stock and negative pledge, however, were never executed. Moreover, the placement fee was never paid, and the $750,000 in escrow was used to pay down a prior loan to Smithtown Nissan by another lender. The plaintiff was not repaid in 30 days when the loan became due. He made written demands for payment on August 21, August 24, September 4, and October 18, 2012. To date, the loan remains unpaid. 
Shortly after making the loan, the plaintiff agreed to provide additional funds to Smithtown Nissan and the Rubios on the same terms and conditions as the previous loan to Oscar. The parties' subsequent agreement was memorialized in a handwritten memorandum dated August 2, 2012, signed by Gary and Andrew Rubio (the "memorandum agreement"). The memorandum agreement does not specify the amount of money to be borrowed or the amount of the placement fee due thereon. In any event, the plaintiff made four advances to the Rubios and Smithtown Nissan in August and September 2012 in the amounts of $15,000, $480,000, $650,000, and $25,000, respectively. To date, all but $40,000 thereof has been repaid. Moreover, additional placement fees in the amounts of $10,000 and $15,000 were due, but not paid, on the $480,000 and $650,000 advances, respectively.
The court notes that the cross-moving defendants appear to combine the two loans together and treat them as one loan in the principal amount of $2,085,800 with a $45,000 placement fee without offering any substantive explanation therefor. It is clear, however, that they are two separate obligations. The first loan is evidenced by the promissory note dated July 6, 2012, signed by Oscar. The second loan is a series of advances made by the plaintiff pursuant to the memorandum agreement dated August 2, 2012, signed by Gary and Andrew.[FN2]
Gary and Andrew did not sign the promissory note, but they guaranteed the first loan along with Smithtown Nissan. Oscar signed the promissory note, but he did not sign the memorandum agreement or guarantee the second series of loans. The court finds that, under these circumstances, there is no basis to combine all of the amounts advanced by the plaintiff into one instrument. Accordingly, the court will treat them as they are documented, as two separate loans. 
In July 2012, Smithtown Nissan was managed by Oscar's other son, the defendant Thomas Rubio, whose mismanagement and diversion of corporate funds purportedly caused the dealership's financial difficulties. As a condition of lending Oscar the $900,000 that he needed to pay NMAC, the plaintiff required that Oscar remove Thomas as the manager and replace him with Gary, a vice president of Smithtown Nissan, and his son Andrew. This was done pursuant to a corporate resolution dated July 6, 2012. In addition, Oscar designated the plaintiff as one of five members of Smithtown Nissan's board of directors and asked him to assist Gary and Andrew [*2]in their joint management of the dealership. The plaintiff agreed and began working at the dealership on or about July 5, 2012. His employment was formalized in a letter agreement dated August 11, 2013, signed by Gary Rubio on behalf of Smithtown Nissan. The letter agreement provides, in pertinent part, as follows: 

 "Following our conversation yesterday and our prior verbal agreement, regarding payment for services rendered, to Smithtown Nissan Inc., an agreement was reached for compensation at the rate of $5,500.00 (five thousand five hundred dollars) payable weekly. In addition, Smithtown Nissan shall fully reimburse all expenses, for travel, lodging, meals, entertainment, and gasoline. The term for this agreement shall be one year commencing July 5, 2012....The parties acknowledge and accept this agreement [as] separate and in addition to any prior agreements, loans, or any other form of service, as such all prior agreements shall remain in full force and effect." 


The $5,500-a-week salary was chosen because it was one-half of the compensation that Thomas had been receiving. The plaintiff's employment at Smithtown Nissan continued until December 2012, when Oscar reinstated Thomas as the manager. 


By a letter dated October 18, 2012, the plaintiff declared the first loan to be in default, and this action ensued. By an order to show cause dated October 26, 2012, signed by Justice Farneti, the plaintiff obtained a temporary restraining order, inter alia, enjoining the defendants from selling, assigning, pledging, transferring, or encumbering any of Oscar's stock in Smithtown Nissan. The temporary restraining order is still in effect. Moreover, pursuant to an escrow agreement dated September 3, 2013, the parties agreed to allow the law firm of Westerman Ball Ederer Miller & Sharfstein, LLP ("Westerman Ball"), attorneys for the plaintiff, to act as escrow agent and hold Oscar's original stock certificates and Smithtown Nissan's corporate kit in escrow until such time as it is directed to release them by court order or written agreement. 
In December 2013, after many conferences with the court and with a view to proceeding to trial, the parties agreed to withdraw all of their pending motions and to conduct depositions. On January 29, 2014, before commencing any depositions, the plaintiff entered into a settlement agreement with Oscar, Gary, and Andrew in which Oscar and Gary acknowledged that the plaintiff is owed the compromised sum of $1.875 million and in which Oscar agreed to transfer his entire ownership interest in Smithtown Nissan (2.25 voting shares and 72.25 non-voting shares) to the plaintiff. The plaintiff, for his part, agreed to withdraw his claims against Oscar; not to pursue any other claims against Oscar, Gary, and Andrew; and to give Andrew an option to repurchase two-thirds of Oscar's stock for $1.875 million which, if exercised, would give Andrew a majority interest in the dealership. Oscar died shortly thereafter on February 24, 2014. By an order dated March 7, 2014, this case was stayed pending the appointment and substitution of a fiduciary. Pursuant to a so-ordered stipulation dated April 13, 2015, Thomas Rubio, as temporary administrator of the Estate of Joseph O. Rubio, was substituted for Oscar as a defendant in this action. The plaintiff now moves for an order enforcing the settlement [*3]agreement, vacating the temporary retraining order, directing Westerman Ball to release Oscar's stock in Smithtown Nissan to him, and discontinuing all claims and counter-claims between the plaintiff and Oscar's estate. The defendants Smithtown Nissan and Thomas Rubio, as the administrator of Oscar's estate, cross move for summary judgment dismissing the complaint insofar as it is asserted against them and for an order disqualifying Westerman Ball from acting as attorneys for the plaintiff.
Contrary to the contentions of the cross-moving defendants, the plaintiff need not commence a plenary action to enforce the stipulation of settlement. A settlement agreement entered into by parties to a lawsuit does not terminate the action unless there has been an express stipulation of discontinuance or actual entry of a judgment in accordance with the terms of the settlement (Church Extension Plan v Harvest Assembly of God, 79 ADd3d 787, 788). Absent such termination, the court retains its supervisory power over the action and may lend aid to a party who has moved for enforcement of the settlement (Id.). No stipulation of discontinuance has been executed in this action and no judgment entered pursuant to the terms of the stipulation of settlement. Accordingly, enforcement of the stipulation by motion is both appropriate and warranted (Id. at 789). 
The court finds that the branch of the cross motion which is for summary judgment dismissing the complaint insofar as it is asserted against Thomas, as the administrator of Oscar's estate, is actually a motion to set aside the stipulation of settlement on the ground that the underlying loan is usurious. Thomas, as the administrator of Oscar's estate, may not set aside the stipulation of settlement in this action. When a party seeks to set aside, invalidate, or modify a stipulation of settlement, a plenary action is required (Id.). Accordingly, the cross motion is denied insofar as it seeks summary judgment dismissing the complaint against Thomas, as the administrator of Oscar's estate. The court will consider the arguments raised by Thomas and Smithtown Nissan in support of summary judgment in opposition to the plaintiff's motion to enforce the settlement agreement, as well as in support of the remaining branch of the cross motion which is for summary judgment dismissing the complaint against Smithtown Nissan.[FN3]

Stipulations of settlement are favored by the courts and not lightly cast aside (Hallock v State of New York, 64 NY2d 224, 230). They are to be enforced with rigor and without a searching examination of their substance (Bonnette v Long Is. Coll. Hosp., 3 NY3d 281, 286), particularly when, as here, the parties were represented by attorneys (see, Matter of Stark, 233 AD2d 450). Strict enforcement of settlements not only serves the interest of efficient dispute resolution, but is essential to the management of court calendars and the integrity of the litigation process (Hallock, supra). Only when there is sufficient cause to invalidate a contract, such as fraud, collusion, mistake, or accident, will a party be relieved from the consequences of a [*4]stipulation made during litigation (Id.). 
The cross-moving defendants raise several affirmative defenses in opposition to enforcement of the settlement agreement. They are: forgery, lack of capacity, unconscionability, undue influence, and usury. The cross moving defendants bear the burden of proof on such affirmative defenses (Brignoli v Balch, Hardy & Scheinman, 178 AD2d 290).
The cross-moving defendants challenge the authenticity of Oscar's signature on the settlement agreement, which is notarized. The notarization of a signature raises a presumption that the signature is genuine (CPLR 4538; Seabord Surety Co. v Earthline Corp., 262 AD2d 253). The presumption is so strong that it can only be rebutted by clear and convincing evidence (Alexander, Practice Commentaries, McKinneys Cons Laws of NY, Book 7B, CPLR 4538, citing Osborne v Zornberg, 16 AD3d 643). The conclusory assertions of counsel for the cross-moving defendants that Oscar's signature on the settlement agreement is a forgery are insufficient to rebut the presumption. Accordingly, the court finds that the cross-moving defendants have failed to establish forgery by clear and convincing evidence.
The cross-moving defendants contend that Oscar lacked the capacity to enter into the settlement agreement because he was suffering from end-stage cancer, "on death's doorstep," and under the influence of several prescription medications at the time. The cross-moving defendants have failed to produce any evidence in admissible form in support thereof. This contention is based entirely on the hearsay affirmation of counsel, surmise and conjecture, and it is unsupported by any medical evidence.[FN4]
Moreover, it is contradicted by the affidavits submitted by the plaintiff from Oscar himself; Gary Rubio; and Oscar's counsel Joseph Ferrante, who represented Oscar in connection with the settlement agreement. Those affidavits reveal that Oscar's consent to the settlement agreement was freely and knowingly given. 
The cross-moving defendants contend that evidence of Oscar's lack of capacity may be found in the disposition of his stock to the plaintiff, which was contrary to his expressed intention to leave it to his grandson Andrew. Consistent with his intentions, however, Oscar obtained from the plaintiff a provision in the settlement agreement allowing Andrew to reaquire an equity interest in Smithtown Nissan. It gives Andrew an option to repurchase two-thirds of Oscar's stock which, if exercised, would give him a majority interest in the dealership. On January 29, 2014, the same day that the settlement agreement was executed, the plaintiff executed a separate option agreement, giving Andrew an option to repurchase 1.5 of Oscar's voting shares and 48.17 of Oscar's non-voting shares for $1.875 million. Accordingly, the court finds that the cross-moving defendants have failed to establish lack of capacity.
The cross-moving defendants contend that the settlement agreement is unconscionable. The doctrine of unconscionability is primarily a means with which to protect the commercially illiterate consumer beguiled into a grossly unfair bargain by a deceptive vendor or finance company (Master Lease Corp. v Manhattan Limousine, Ltd., 177 AD2d 85, 90). To establish unconscionability, the cross-moving defendants must show both a lack of meaningful choice and the presence of contractual terms that unreasonably favor one party (Gillman v Chase Manhattan Bank, 73 NY2d 1, 10). This definition reveals two major elements that have been labeled by commentators as procedural and substantive unconscionability (Master Lease Corp. v Manhattan Limousine, Ltd., supra at 88-89). The procedural element concerns the contract-formation process and the lack of meaningful choice. The substantive element looks to the content of the contract per se (Id. at 89). Unconscionability is rarely found in a wholly commercial setting (Dallas Aerospace v CIS Air Corp., US Dist Ct, SDNY, Oct. 31, 2002, Jones, J. [2002 WL 31453789], affd 352 F3d 775 [2nd Cir]; see also, Master Lease Corp. v Manhattan Limousine, Ltd., supra).
The only evidence in the record of the contract-formation process was submitted by the plaintiffs, i.e., the affidavits of Oscar, Gary, and Joseph Ferrante. The cross-moving defendants have produced no contradictory evidence and appear to rely entirely on the terms of the settlement agreement itself, contending that it is one-sided and "fundamentally unfair." While there have been some extreme cases in which the contractual terms are so outrageous and oppressive as to warrant a finding of unconscionability on the substantive element alone, irrespective of the contract-formation process, such cases are the exception (see, Gillman v Chase Manhattan Bank, supra at 12; Master Lease Corp. v Manhattan Limousine, Ltd., supra at 89). This case does not fall within the exceptional category.
The cross moving defendants have failed to establish that the settlement agreement unreasonably favors the plaintiff. The cross-moving defendants contend that Oscar's stock was worth approximately $10 million and that Oscar essentially gifted it to the plaintiff for $1.875 million. However, the conclusory affirmation of Theodore Richman (the corporate attorney for Smithtown Nissan), upon which the cross-moving defendants rely, is insufficient to establish the value of Oscar's ownership interest in Smithtown Nissan. Moreover, the plaintiff would not have a right to retain two-thirds of Oscars' shares if Andrew exercised his option to repurchase them for the compromised sum of $1.875 million, giving Andrew a majority interest in the dealership. Under these circumstances, in view of its commercial context, the court finds that the settlement agreement is not substantively unconscionable. 
Even considering the contract-formation process, the record does not reflect a lack of meaningful choice. Oscar was an experienced businessman who was represented by counsel. As previously discussed, the cross-moving defendants have failed to establish that he lacked the capacity to enter into the settlement agreement. Moreover, the there is no evidence in the record that deceptive or high-pressure tactics were employed to obtain his consent (Gillman v Chase Manhattan Bank, supra at 11). Rather, the affidavits submitted by the plaintiff reveal that his consent was freely and knowingly given. Moreover, the agreement itself reflects that it was the [*5]product of negotiation or bargaining in that Oscar obtained an option for Andrew to repurchase two-thirds of his shares, which was important to him. Accordingly, the court finds that the settlement agreement is neither procedurally nor substantively unconscionable.
The cross-moving defendants contend that the settlement agreement is the product of undue influence. Undue influence is a form of duress (see, McIntosh v Consolidated Edison Co. of New York, Inc., US Dist Ct, SDNY, March 19, 1999, Baer, J., at *2 [1999 WL 151102], affd 216 F3d 1072 [2nd Cir]). Duress may not be found merely from the existence of a difficult bargaining position or the pressure of financial circumstances (Id.). To succeed on a theory that the settlement agreement was procured by duress, the cross-moving defendants must show that Oscar was compelled to agree to its terms by way of wrongful and oppressive conduct that precluded him from exercising his own free will (Id.). The cross moving defendants have made no such showing. The record reflects that Oscar was under no obligation to settle with the plaintiff. Moreover, as previously discussed, his consent to the settlement agreement was freely and knowingly given. Accordingly, the cross-moving defendants have failed to establish undue influence.
The cross-moving defendants contend that the settlement agreement should not be enforced because the underlying loans are criminally usurious. The plaintiff contends, in opposition, that Oscar waived the defense of usury and that, in any event, the loans are not usurious.
A transaction is usurious under civil law when it bears an annual interest rate exceeding 16% and under criminal law when it bears an annual interest rate exceeding 25% (General Obligations Law § 5-501; Banking Law § 14-a; Penal Law § 190.40; Venables Sagona, 85 AD3d 904, 905). Usury is to be determined as of the time that the contract or obligation is entered into (Matter of Estate of Jackson, 120 AD2d 309, 313). Moreover, the borrower bears the burden of proving usury by clear and convincing evidence, and usury will not be presumed (Oliveto Holdings, Inc. v Rattenni, 110 AD3d 969, 972).
The long-standing rule in New York is that civil usury is a waivable defense (Feldman v Torres, 34 Misc 3d 47, 49 [App Term 2nd, 11th, & 13th Jud Dist]). It is purely a matter of private right and does not involve any considerations of public policy (Hammelburger v Foursome Inn Corp., 76 AD2d 646, 649, mod on other grounds 54 NY2d 580). However, when a right has been created for the betterment or protection of society as a whole, an individual is incapable of waiving that right (Id.). Criminal statutes, in general, and criminal usury statutes, in particular, fall within the class of rules created for the protection of society as a whole (Id.). Criminal usury statutes were enacted in an effort to protect the public from loansharking, "one of the most heinous, virtually bloodsucking criminal activities of all times" (Id.). It follows, then, that a party cannot waive his right to be protected from criminally usurious loans (Id.). The right is not personal to the borrower, so as to be waivable by him. The right exists for the benefit of everyone (Id.).
In an affidavit executed contemporaneously with the settlement agreement, Oscar withdrew all of the defenses and counterclaims that he had previously raised in this action, "including, but not limited to, the defense that any of the loans made by [the plaintiff] were usurious." This constitutes a waiver of the defense of civil usury only, since the defense of criminal usury cannot be waived.[FN5]

As previously discussed, stipulations of settlement are favored by the courts and not lightly cast aside (Hallock v State of New York, 64 NY2d at 230). Judicial policy has been so solicitous of stipulations that even constitutionally secured rights, as well as those evinced by a positive act of the Legislature, may validly be waived without offending public policy (Nishman v DeMarco, 76 AD2d 360, 370). There are comparatively few instances in which public policy prohibits the enforcement of a stipulation (Id. at 371). Included among them are those instances in which enforcement of a stipulation would result in enforcing an underlying contract that is illegal (Id., citing Baksi v Wallman, 271 App Div 422, affd 297 NY 456). Thus, a settlement agreement purporting to compromise and release a borrower's usury claim is void and unenforceable if the original usurious obligation transcends into the parties' subsequent agreement (44B Am Jur 2d, Interest and Usury § 211). On the other hand, if the parties agree to abandon their usurious agreement and execute a new obligation for the amount of the actual debt, free from usury and bearing only legal interest, the second agreement purges the first of its usurious taint and makes the second obligation valid and enforceable (Matter of Estate of Jackson, 120 AD2d at 313). 
The cross-moving defendants contend that the stipulation of settlement enforces the underlying loans, which are criminally usurious. As previously noted, a transaction is usurious under criminal law when it bears an annual interest rate exceeding 25% (Penal Law § 190.40; Venables Sagona, 85 AD3d at 905). The loans that are the subject of this action bear an annual interest rate of only 8%. The cross-moving defendants attempt to raise the interest rate to 36% by arguing that the placement fees were actually additional interest in disguise.
A lender may charge reasonable expenses attendant on a loan without rendering the loan usurious provided that the expenses charged are not a pretext for higher interest (Lloyd Corp. v Henchar, Inc., 80 NY2d 124, 127). However, when fee payments do not actually reimburse a lender for expenses associated with the loan, and instead are a disguised loan payment, the fees are appropriately considered when determining the interest rate (Hillair Capital Investments v Integrated Frieght Corp., 963 F Supp 2d, 336, 339, citing Lloyd Corp. v Henchar, Inc., supra).
The promissory note provides, in pertinent part, as follows:

 "12.PLACEMENT FEE. BORROWER shall pay a placement fee in the sum of TWENTY THOUSAND ($20,000.00) DOLLARS for LENDER's services in connection with the funding of the subject loan. Said payment is to be made within ten (10) days from the date hereof."

The record reflects that the placement fee was intended to cover the expenses that the plaintiff would incur, as well as his services, in connection with the funding of the loan. For example, the plaintiff anticipated that he would incur due diligence expenses such as accounting and legal fees, title searches on the collateral properties, inspection of the dealership's books and records, UCC searches, and appraisal of the dealership property, among other things. Moreover, since the loan was being made on a emergency basis for only 30 days, the placement fee was also intended to compensate the plaintiff for the services that he was to provide to find permanent financing for the Rubios, per their request. Although the plaintiff admits that he could not perform due diligence because Oscar failed to produce the collateral for the loan, the record reflects that he contacted and worked with several lending institutions to try to "place" the loan, i.e., secure permanent financing. Thus, he performed the agreed-upon services in connection with the funding of the loan, which was the stated purpose of the placement fee.
In any event, even if the placement fee is considered to be interest, the total interest payment is still under the 25% needed for criminal usury. The cross-moving defendants contend that the placement fee was due "upon maturity" of the loan. Since the loan matured in 30 days, they add the placement fee to the interest payment due each month to arrive at a total interest rate of 36% per annum. However, the promissory note explicitly provides that the placement fee "is to be made within ten (10) days from the date hereof." 
It is well settled that a contract is to be construed in accordance with the parties' intent (MHR Capital Partners LP v Presstek, Inc., 12 NY3d 640, 645). The best evidence of what the parties intended is what they said in their writing (Greenfield v Phillies Records, Inc., 98 NY2d 562, 569). A written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms (Id.). A court may not write into a contract conditions the parties did not include by adding or excising terms under the guise of construction (see, Reiss v Financial Performance Corp., 97 NY2d 195, 199). Moreover, a court should be extremely reluctant to interpret an agreement as impliedly stating something that the parties have neglected to specifically include (see, Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475). 
Applying these principles, the court finds that the cross-moving defendants' interpretation of paragraph 12 of the promissory note is contrary to its plain meaning. The parties did not intend for the placement fee to be a recurring fee payable every 30 days after the note became due, but a one-time fee payable 10 days after the promissory note was executed. Since the promissory note was executed on July 6, 2012, the $20,000 placement fee was due on July 16, 2012. Adding $20,000 to the $73,200 annual interest due on the first loan results in an interest rate of 10% per annum. When the same analysis is applied to the second series of loans, the [*6]result is the same. Adding $25,000 to the $93,664 annual interest due on the additional funds borrowed also results in an interest rate of 10% per annum. Ten per cent is well below the 25% per annum needed for criminal usury. 
The cross-moving defendants further contend that the plaintiff's employment agreement was a sham and that the $5,500-a-week salary was disguised interest, raising the interest rate on the loans above 25% per annum.
One well-recognized way of concealing a usurious transaction is an obstensibly unrelated contract providing for payment by the borrower for the lender's services, which are of little value or which are not, in fact, rendered (In re Rosner, 48 BR 538, 548). Factors to consider in determining whether an employment contract is merely a device or subterfuge to conceal usury are whether entry into the employment contract was an explicit condition to receipt of the loan; whether the fee paid was directly related to the size of the loan and rose and fell with the amount of the loan; whether a default in the payment for services under the contract was a default under the loan agreement; whether the borrower could elect to accept, reject, or terminate the employment agreement; and whether the lender was under an obligation to furnish any services (Id. at 549).
Relying on the terms of the employment agreement alone, the cross-moving defendants contend that, since the agreement did not set forth the services that the plaintiff was expected to perform for Smithtown Nissan, his entire salary should be considered additional interest on the loan. 
The plaintiff began working at Smithtown Nissan at Oscar's request in July 2012, after Thomas had been removed as the manager due to his purported diversion of corporate funds. The record reflects the plaintiff went to the dealership seven days a week until his employment was terminated in December 2012, when Oscar reinstated Thomas as the manager.[FN6]
The plaintiff's responsibilities included supervising and firing employees; participating in meetings with vendors; reviewing financial records, progress reports, and sales goals; and developing plans and strategies to increase the dealership's profitability. There is no evidence in the record to suggest that entry into the employment agreement was a condition precedent to the Rubios' receipt of the loans. The employment agreement was not executed contemporaneously with the promissory note or the memorandum agreement, neither of which made any reference to the plaintiff's employment at the dealership. The parties even acknowledged in the employment agreement that it was "separate and in addition to any prior agreements [or] loans." The employment agreement provided for retroactive compensation for the period from July 5 though August 5, 2012, indicating that the plaintiff had been working at the dealership without [*7]compensation when the agreement was executed. The plaintiff's salary was not tied to the amounts due on the loans, but was a fixed amount equal to one-half of the salary that Thomas had been receiving. A default in the payment of the plaintiff's salary was not an event of default under either the promissory note or the memorandum agreement. Moreover, the Rubios were free to terminate the plaintiff's services, which they did when Oscar reinstated Thomas as the manager. Finally, execution of the employment agreement was consistent with the plaintiff's designation as one the members of Smithtown Nissan's board of directors. Both were done at about the same time, and both were a way to give the plaintiff hands-on involvement in the business. The court finds that, under these circumstances, the employment agreement was not a device to extract an exorbitant rate of interest from the Rubios and Smithtown Nissan. Accordingly, the court finds that the cross-moving defendants have failed to establish usury by clear and convincing evidence. 
Given the strong public policy in favor of enforcing settlements and the cross-moving defendants' failure to establish sufficient cause to invalidate the settlement agreement on the basis of forgery, lack of capacity, undue influence, unconscionability, or usury, the court finds that the settlement agreement is enforceable. Accordingly, the branches of the plaintiff's motion which are for an order enforcing the settlement agreement and discontinuing all claims and counterclaims between the plaintiff and Thomas Rubio, as the administrator of Oscar's estate, are granted.
The cross-moving defendants contend that the settlement agreement should not be enforced because it is subject to prior agreements transferring some of Oscar's stock to Thomas and giving third-party Craig Fina an option to purchase 15% of Smithtown Nissan's stock.[FN7]
The court finds that the competing claims to Oscar's shares by Thomas Rubio and Craig Fina do not affect the enforceability of the settlement agreement. Until those claims are resolved, however, the court declines to release any of Oscar's shares to the plaintiff. Accordingly, the branches of the plaintiff's motion which are for an order vacating the temporary retraining order and directing Westerman Ball to release Oscar's stock in Smithtown Nissan to the plaintiff are denied as premature.
The court has already denied the branch of the cross motion which is for summary judgment dismissing the complaint insofar as it is asserted against Thomas, as the administrator of Oscar's estate. The branch of the cross motion which is for summary judgment dismissing the complaint insofar as it is asserted against Smithtown Nissan is also denied in view of the cross moving defendants' failure to establish that the loans are usurious. The branch of the cross-motion which is for an order disqualifying Westerman Ball as attorneys for the plaintiff is denied as academic.

Finally, the plaintiff's application for attorney's fees is deferred until such time as the court shall direct. Accordingly, the branch of the plaintiff's motion which is for attorney's fees is [*8]denied without prejudice.
Dated: May 2, 2016
J.S.C.



Footnotes

Footnote 1:The promissory note executed by the plaintiff and Oscar included a prior loan in the principal amount of $15,800. Thus, the face amount of the note is $915,800.

Footnote 2:The court notes that Gary is not a party to this action despite the fact that he signed the memorandum agreement dated August 2, 2012. Andrew also signed the memorandum agreement, but the word "witness" appears next to his name. Smithtown Nissan is not named in the memorandum agreement as the "borrower," although the agreement indicates that the additional funds were being provided on its behalf. Moreover, the signature block does not reference Smithtown Nissan in any way. It is, therefore, unclear whether the parties intended to bind Smithtown Nissan in its corporate capacity. Smithtown Nissan is, however, a defendant in this action. The fourth cause of action seeks to recover from it the additional funds borrowed under the memorandum agreement. Smithtown Nissan does not argue in support of summary judgment that it is not liable on the second series of loans because it was not a signatory to the memorandum agreement. Accordingly, the court presumes that Smithtown Nissan has assumed liability for the second series of loans. 

Footnote 3:Smithtown Nissan was not a party to the settlement agreement, which was signed by Oscar, Gary, and Andrew in their individual, and not in their corporate, capacities. Accordingly, the branch of the cross motion which is for summary judgment dismissing the complaint against Smithtown Nissan is not a motion to set aside the settlement agreement.

Footnote 4:The cross-moving defendants have failed to explain why information regarding Oscar's medical condition could not have been obtained by Thomas Rubio, as the administrator of Oscar's estate, and why any pertinent information could not have been included in their opposition to the plaintiff's motion. 

Footnote 5:The defense of civil usury is unavailable to Smithtown Nissan, which is a corporation (General Obligations Law § 5-521 [1]). Smithtown Nissan, however, can still assert criminal usury as a defense (General Obligations Law § 5-521 [3]).

Footnote 6:The employment agreement was for a fixed term of one year commencing on July 5, 2012. Thus, the plaintiff's termination in December 2012 was a breach of the employment agreement.

Footnote 7:Fina, who was employed by Smithtown Nissan as a sales manager, loaned Oscar and the dealership $640,000 in exchange for the option.