■ Buster Green, Appellant, v 119 West 138th Street LLC et al., Respondents, et al., Defendant. [37 NYS3d 491]—

Order and judgment (one paper), Supreme Court, New York County (Richard F. Braun, J.), entered September 11, 2014, which, insofar as appealed from as limited by the briefs, granted defendants-respondents' motions for summary judgment to the extent of declaring in defendants' favor on counts one, two and three of the complaint, dismissing the remaining request for relief in those counts, and dismissing the counts alleging fraud as against defendants 119 West 138th Street LLC (119 West) and Abyssinian Development Corporation (ADC), and declared that 119 West was the rightful and sole fee owner of the property at issue, that defendants Wachovia Bank National Association now known as Wells Fargo Bank, N.A. (Wachovia) and Seedco Financial Services, Inc. (Seedco) maintain duly recorded mortgage liens against the property unaffected by plaintiff's claims, and that the notice of pendency filed by plaintiff in the New York County Clerk's Office on February 17, 2012 under index No. 101761-12, and as against the property, is cancelled and discharged, reversed, on the law, without costs, the order and judgment vacated, the dismissed claims reinstated, and the matter remanded for further proceedings.

Plaintiff commenced this action in February 2012 against ADC, 119 West and several other defendants, seeking an order (1) discharging the quitclaim deed he executed in favor of defendants ADC and 119 West on the ground that it was unconscionable; (2) discharging the mortgages on the property held by defendants Wachovia and Seedco as void; (3) requesting damages for fraud and conversion against ADC and 119 West; and requesting damages for unjust enrichment against ADC and 119 West. The factual allegations underlying this action are as follows:

Plaintiff purchased an unimproved lot located at 119 West 138th Street in Manhattan from the City in 1973 at a tax sale. The deed from this sale was never recorded. ADC became interested in purchasing this property sometime in 2002. Its counsel, Charles E. Simpson, testified at a deposition that after a search of City records he discovered tax liens and schedules indicating that a man named Alfred Logan, then deceased, had paid taxes on this property and that Logan's heirs had filed a bankruptcy petition listing the property as an asset of the estate. In February 2004, ADC entered into a contract to

purchase the property from Logan's heirs through a bankruptcy court-authorized sale for $350,000. ADC assigned the contract to 119 West. 119 West's title insurer and construction lender requested it to bring an action to quiet title, which was commenced in 2007. During that proceeding, the 1973 unrecorded deed from the City to plaintiff was discovered, and, since plaintiff was in the chain of title, he was added as a defendant.

Simpson stated he thereafter located and spoke to plaintiff, who told Simpson that he sold the property to Logan several years prior and was amenable to executing a quitclaim deed if he was paid to do so. Simpson offered plaintiff $2,500 but denied making any representations as to the value of the property. Plaintiff failed to appear to sign the quitclaim deed as arranged, and, several months later, Simpson contacted him again and offered $5,000 if plaintiff would sign. Simpson stated that he advised plaintiff to have an attorney present, but plaintiff declined, signed the deed, and deposited the $5,000 check. Thereafter, Simpson discontinued the quiet title action.

Plaintiff, 80 years old at the time of his deposition, testified that he was retired and had a ninth grade education. He stated that he had purchased approximately 10 properties from the City in the past but never sold any of them. He was under the impression that the City sold the properties when he stopped paying taxes on them. With respect to this particular lot, plaintiff stated that he stopped paying taxes on it in 1983 and believed the City had sold it at a tax lien auction. Although plaintiff stated he did not know what a quitclaim deed was, he "signed something to them [i.e., ADC and 119 West] for $2,500," even though he did not believe that he owned the property at that time. Plaintiff testified that he was unaware the property was worth $1 million and that "they did me wrong in . . . not telling me that the property was worth more money or offering me more money than they did." Significantly, he also testified that he did not know Logan, and that the first time he heard anything about Logan was from Simpson. Finally, he testified that he was never made aware that he had been named as a defendant in the quiet title action.

Defendants moved for summary judgment dismissing the complaint. The motion court granted the motion to the extent of declaring in defendants' favor on the first three counts of the complaint and dismissing the remaining claims save for

plaintiff's claim for unjust enrichment. We now reverse to the extent appealed from as limited by the briefs.[1]

Defendants failed to demonstrate, as a matter of law, that plaintiff was not the owner of the property at the time that he signed the quitclaim deed at issue and that therefore he lacked standing to challenge the deed. Although plaintiff testified that he believed that the property had been repossessed by the City after he failed to pay real estate taxes, defendants offered no evidence to show that in rem foreclosure proceedings actually occurred divesting plaintiff of his ownership. Instead, ADC and 119 West maintained that plaintiff sold the property directly to Logan. There is an issue of fact as to whether this had occurred, and the conflicting testimony from Simpson and plaintiff regarding Logan is material to the resolution of this action. Without a foreclosure, plaintiff would have retained title to the property, regardless of whether he believed that the City had repossessed it. There is also no evidence that the property was ever deeded to Logan, either by a foreclosure sale from the City or by direct sale from plaintiff. The record only contains tax documents indicating that Logan had paid taxes on the property, and these City records, do not, as a matter of law, constitute prima facie evidence of Logan's title to the property, as the dissent contends. Significantly, there is no authority to support the contention that subsequent payment of real estate taxes by a third party constitutes conclusive evidence that legal title had thus been transferred to that party as a result of such payment. To argue that "Logan may well have purchased this property at a tax lien auction" is mere speculation and is without support in the record. Indeed, since there is no deed to Logan from either plaintiff or the City, recorded or otherwise located anywhere, 119 West's title company and lenders rightfully demanded that it bring an action to quiet title. The purpose of such an action is to cut off any claims by prior owners and to remove any clouds on title which, in this case, clearly exist. These issues cannot be determined as a matter of law and require a trial.

Plaintiff also raised issues of fact as to whether the quitclaim deed, in which he transferred the property worth over $1 million for $5,000, was unconscionable or procured by fraud. The doctrine of unconscionability, "which is rooted in equitable principles, is a flexible one" that "generally requires a showing that the contract was both procedurally and substantively unconscionable when made" (*Gillman v Chase Manhattan*

---

1. Plaintiff does not challenge the dismissal of the Real Property Law § 265 and conversion claims.

*Bank*, 73 NY2d 1, 10 [1988]). The procedural element requires examination of "such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, . . . the experience and education of the party claiming unconscionability, and whether there was [a] disparity in bargaining power (*id.* at 11 [citation omitted]).

Here, there are no allegations that high-pressure tactics were used. Although plaintiff had only a ninth grade education, he was, as the dissent correctly observes, no neophyte when it came to tax lien foreclosures. While plaintiff concedes that Simpson made no representations as to the value of the property, there is no doubt that Simpson was aware the property had significant value, as evidenced by the contract of sale with Logan's heirs for $350,000. Moreover, a factfinder should be given the opportunity to assess the credibility of plaintiff and Simpson regarding such issues as whether Simpson told plaintiff the quitclaim deed was a "mere formality" since ADC had already purchased the property, whether plaintiff was told that the quitclaim deed would divest him of his ownership rights, whether plaintiff was told he was a defendant in the quiet title action, and whether plaintiff had ever been divested of title by either a tax sale by the City or direct sale to Logan.

No one procedural factor can be relied upon to support or discount a claim of procedural unconscionability. Such claims are most often fact sensitive and dependent upon the particular circumstances surrounding a transaction, which, at the very least, mandate the opportunity for an evidentiary hearing (*Matter of State of New York v Avco Fin. Serv. of N.Y.*, 50 NY2d 383, 390 [1980]). Certainly, the factual allegations as set forth above raise material issues of fact as to whether plaintiff was afforded a "meaningful choice" in his decision to execute the quitclaim deed and whether the terms of the agreement are "unreasonably favorable" to ADC and 119 West (*id.* at 389 [internal quotation marks omitted]). These issues cannot be resolved by summary judgment.

With respect to the element of substantive unconscionability, we also find that there are material issues of fact. In order to determine if the agreement is substantively unconscionable, there must be an "analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged" (*Gillman*, 73 NY2d at 12; *Avco Fin. Serv.*, 50 NY2d at 389). As noted, despite the fact that plaintiff believed he no longer owned the property, there is nothing in this record to indicate that he was

ever divested of title by either an in rem proceeding or direct sale to Logan. Significantly, there is no evidence that a deed to Logan, by either the City or plaintiff, was ever recorded, or indeed, even exists. That being the case, it is clear that plaintiff's quitclaim of his interest in a $1 million property for $5,000 may be viewed as "unreasonably favorable" to ADC and 119 West, meeting the substantive element of unconscionability (50 NY2d at 389 [internal quotation marks omitted]).

For the reasons stated, we cannot agree with our dissenting colleague that the record supports a finding that plaintiff was not the owner of the property at the time he signed the quitclaim deed. Nor can we agree that ADC was a good faith bona fide purchaser of the property. While ADC certainly did pay value for the property, it could not have lawfully purchased the property from Logan's heirs pursuant to the bankruptcy court order if Logan never owned the property.

Our decision in *Commandment Keepers Ethiopian Hebrew Congregation of the Living God, Pillar & Ground of Truth, Inc. v 31 Mount Morris Park, LLC* (76 AD3d 465 [1st Dept 2010]), cited by the dissent, does not require a different result. In that case, we affirmed the dismissal of the plaintiffs' claims to any interest in the property purchased by the defendants, because defendants purchased the property for value, had no notice of the fraudulent intent of the immediate grantor, and had obtained two Supreme Court orders authorizing the sale (*id.* at 465). Significantly, however, the defendant buyers "demonstrated that a title search conducted prior to the closing revealed that *the seller was the record owner of the property*" (*id.* [emphasis added]). That is clearly not the case here. The title company and construction lender requested that 119 West commence an action to quiet title precisely because the record owner of this parcel could not adequately be determined, and they wanted to ensure no person or entity would assert a claim to the property superior to ADC.

The determinations of the factual issues raised herein can only be made by the trier of fact and we remit this matter for further proceedings. Concur—Sweeny, Manzanet-Daniels and Gesmer, JJ.

Tom, J.P., and Gische, J., dissent in a memorandum by Tom, J.P., as follows: The evidence in the record establishes that the quitclaim deed, which plaintiff sought to set aside, was neither procedurally nor substantively unconscionable when entered into by the parties (*see Gillman v Chase Manhattan Bank*, 73 NY2d 1, 10 [1988]). The evidence also establishes that defendant Abyssinian Development Corporation (ADC) was a bona

fide purchaser of the property and that, following the property's transfer to defendant 119 West 138th Street, LLC, 119 West became the rightful and sole fee owner of the property. Thus, Supreme Court properly declared in defendants' favor on counts one through three in the complaint, properly dismissed the remaining request for relief in those counts, and properly dismissed the fraud counts.

Plaintiff purchased the unimproved lot located at 119 West 138th Street from the City in 1973. He had significant experience with real estate and was not a neophyte to real estate investment, testifying at his deposition that he had purchased about 10 properties from the City in the past. As with his other properties, plaintiff stated that the City foreclosed on this property when he failed to pay taxes. Specifically, he believed that the City sold the property at a tax lien auction in 1983, and thus he conceded that he lost ownership of the property because he stopped paying taxes on it.

In 2002, ADC, a not-for-profit corporation that operates a church across the street from the property, became interested in purchasing the long-vacant property. After a search of city records, ADC discovered from city tax liens and schedules that a man named Alfred Logan, then-deceased, had paid the taxes on the property, and that Logan's heirs had filed a bankruptcy petition. In February 2004, ADC entered into a contract to purchase the property from Logan's heirs through a bankruptcy court-authorized sale for $350,000. Pursuant to the bankruptcy court's order, the sale could not be consummated until the Kings County Surrogate's Court permitted the transfer, which it did in March 2004. Then, ADC assigned the contract to 119 West. 119 West's title insurer and construction lender requested that 119 West commence an action to quiet title, which 119 West did in 2007. During the course of that action, 119 West discovered the unrecorded 1973 deed from the City to plaintiff, so 119 West named plaintiff in the action to quiet title.

Charles E. Simpson, ADC's counsel, located plaintiff, who told Simpson that he had sold the property to Logan several years prior. At his deposition, plaintiff denied making that sale but conceded he lost ownership through foreclosure. According to Simpson, plaintiff was amenable to executing a quitclaim deed in favor of 119 West provided he was paid to do so, and Simpson told plaintiff that he would pay him $2,500 for his trouble. After plaintiff failed to appear to sign the quitclaim deed for several months, Simpson promised him $5,000 to sign. On January 25, 2008, plaintiff signed the quitclaim deed. Although Simpson had advised plaintiff to have an attorney

present for the signing, plaintiff declined. Plaintiff deposited the $5,000 check, and Simpson then discontinued the quitclaim action. Simpson denied ever making false representations about the value of the property to plaintiff.

Initially, the evidence, including the tax lien documents and plaintiff's admissions at his deposition (*see People v Brown*, 98 NY2d 226, 232 n 2 [2002]), conclusively establishes that plaintiff was not the owner of the property, and that the property was owned by Logan. Accordingly, ADC, which paid valuable consideration for the property in good faith, and received the permission of the bankruptcy court and the Kings County Surrogate's Court to make the purchase from Logan's heirs, was a bona fide purchaser of the property and, following transfer to 119 West, 119 West became the rightful and sole fee owner of the property (*see Commandment Keepers Ethiopian Hebrew Congregation of the Living God, Pillar & Ground of Truth, Inc. v 31 Mount Morris Park, LLC*, 76 AD3d 465 [1st Dept 2010]).[2]

The majority maintains that, because ADC and 119 West cannot show that in rem foreclosure proceedings occurred, there is an issue of fact as to whether plaintiff owned the property. However, the tax lien documents and plaintiff's admissions at his deposition—including the fact that he has not paid taxes on the property since 1983 and that he believed the City had sold the property at a tax lien auction—are sufficient to establish that plaintiff was no longer the owner of the property, that Logan was listed as the property owner on the city tax lien certificates for the years 1998 and 2003, and that Logan had been paying taxes on this property. City records listing Logan as owner of the property are prima facie evidence of Logan's ownership of the property. The fact that plaintiff denies having sold the property to Logan, without more, is not a basis to find that he retained ownership of the property in the face of the documents produced. Logan may well have purchased this property at a tax lien auction.

While plaintiff may have been less educated than ADC's counsel, he was not an unsophisticated individual when it came to real estate and tax lien foreclosures. Further, as the majority recognizes, plaintiff conceded at his deposition that Simpson made no representations as to the value of the property when he signed the quitclaim deed, and since there was no evidence

---

**2.** The majority's effort to distinguish *Commandment Keepers* fails. As in this case, the purchaser in *Commandment Keepers* paid valuable consideration for the property in good faith, and in both cases the sale was expressly permitted by the court (76 AD3d at 465).

of any "high-pressure tactics" on the part of ADC, the bona fide purchaser of the property, or evidence of a "lack of meaningful choice," plaintiff's procedural unconscionability claims fail (*Gillman*, 73 NY2d at 10-11). Accordingly, contrary to the majority's conclusion, plaintiff failed to raise issues of fact as to the procedural unconscionability of the contract. Therefore, there is no reason a factfinder should be given an opportunity to assess the circumstances of the execution of the quitclaim deed.

Moreover, plaintiff also testified that he had no discussions about the fair market value of the property with Simpson. Accordingly, there is no proof of misrepresentation of a material fact to support the fraud claims (*see Small v Lorillard Tobacco Co.*, 94 NY2d 43, 57 [1999]).

Nor is there any evidence to support the claim that the quitclaim deed was substantively unconscionable. While there was evidence that at the time plaintiff executed the quitclaim deed the property was worth more than $1 million, the payment of $5,000 to plaintiff was not unreasonably favorable to ADC given the fact that plaintiff had not owned the property for some time, as reflected by the 2004 purchase of the property by ADC from Logan's heirs pursuant to orders of the bankruptcy court and Kings County Surrogate's Court; had not paid taxes on it; and had essentially abandoned it as far back as 1983. In addition, all the information regarding the value of the property could have been obtained from the public record.

The fact that there is no evidence that a deed to Logan was ever recorded does not make the quitclaim deed substantively unconscionable, in light of the foregoing facts.

Accordingly, I would affirm the order and judgment of the Supreme Court as indicated.